[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 14, 2011
JOHN LEY
CLERK

No. 08-14736

_____

D. C. Docket No. 05-00269-CR-TWT-9-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RILEY GRAHAM,
a.k.a. Riley Williams,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 14, 2011)

Before EDMONDSON, CARNES, and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

Riley Graham was indicted along with seventeen other people in a mortgage

fraud case.[1]  He was tried separately from his co-defendants because he insisted on proceeding pro se—at least until the very day his trial began.  After a four-day trial, at which he was represented by counsel, a jury returned a guilty verdict on all counts, and he was convicted.  His appeal was consolidated with his co-defendants' appeals.  See Fed. R. App. P. 3(b)(2).  We are issuing this separate opinion in Graham's case in order to address the three issues he has raised, which are distinct from the issues his co-defendants have raised.

I.

The jury's guilty verdict against Graham was on all of the offenses charged against him in the third superseding indictment:  conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 and 1343 (count 15); wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (counts 16–18, 46 & 47); conspiracy to commit mail fraud, to commit wire fraud, to make false credit applications, to launder money, and to engage in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 371, 1341, 1343, 1014, 1956(a)(1)(A)(i) &

---

[1]Of the seventeen other people named in that third superseding indictment with Graham, twelve were tried together, ten were convicted, and nine appealed together:  Phillip Hill, Marcus Alcindor, Robert Powers, Christine Laudermill, David Van Mersbergen, Fred Farmer, David Thomas, Leslie Rector, and Barbara Brown.  That consolidated appeal is addressed in a separate opinion issued today, which includes a detailed recitation of the facts underlying the mortgage fraud scheme that led to Graham's indictment and convictions.  See United States v. Hill, No. 07-14602, — F.3d — (11th Cir. June 14, 2011).  This opinion addressing Graham's appeal sets forth only those facts that are relevant to the three issues he has raised.

(B)(i), and 1957 (count 19); mail fraud in violation of 18 U.S.C. § 1341 and 2 (count 38); engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. §§ 1957 and 2 (counts 85–90 & 94); and money laundering in violation of 18 U.S.C. §§ 1956(a)(1), (A)(i), & (B)(i) and 2 (counts 179 & 180). Counts 15–18 involved a fraudulently obtained loan from Centrum Financial Services, and the other counts arose from various loans on residential real estate. Graham was convicted and sentenced to 60 months imprisonment on counts 15–19, 46, and 47, running concurrently with a 120-month sentence on the remaining counts, 38, 85–90, 94, 179, and 180, for a total of 120 months.[2]

Graham challenges his convictions, contending that (1) his right to counsel and due process rights were violated because the district court denied his request for a continuance on the first day of trial; (2) his due process rights were violated because he appeared before the jury in an orange jail suit instead of in street clothes; and (3) his right to a fair trial was violated because the district court admitted "expert" testimony by lay witness William Key, a former closing attorney who had pleaded guilty to participating in fraudulent mortgage transactions.

---

[2]Graham has been imprisoned since 2003 and is serving a 20-year sentence for an earlier drug offense conviction in Michigan. His sentence in the present case runs consecutive to that earlier one.

II.

Graham made his initial appearance in the district court on August 11, 2006, when he pleaded not guilty. On August 23, 2006, Graham told the court he wanted to proceed pro se, and the next day the court appointed Scott Semrau as standby trial counsel for Graham.[3] During a September 8, 2006 pre-trial conference, the district court judge emphatically warned Graham about the risks of proceeding pro se and extensively questioned him about his ability to do so. The trial was specially set for August 20, 2007.

In a September 25, 2006 status conference before a magistrate judge, that judge also warned Graham:

> Okay. Again, Mr. Graham, you have got good counsel there.
>
> I do encourage you to make use of the resources that have been provided.
>
> And I caution you again about what everybody would caution you about.
>
> It's a mistake to try to represent yourself, but I wish you luck.

Standby counsel Semrau was present at that hearing. On the subject of discovery, Semrau told the magistrate judge:

> We received volumes of information from the Government, four CDs

---

[3]Semrau is serving as Graham's appellate counsel.

4

or five.

We have copied them, and we are in the process of mailing those to Mr. Graham.

So I agreed to being the middleman to that extent.

And then also to a certain degree there's just things that he can't get to.

And I have agreed to be his eyes and ears, I suppose.

For instance, I think much of the discovery in this case is contained in a room at the Federal Defender's Office; and I have agreed to go in and get an index of that material and provide that to Mr. Graham.

The government told the magistrate judge that "we have made everything available that we have right now." The judge gave Graham an extension of 30 days to file motions.

In a July 25, 2007 status conference, Graham asked for a continuance because he was having trouble viewing discovery on the CDs that the government had provided. The district court granted the request, continuing the trial to the next available calendar. The district court judge had this exchange with Graham:

THE COURT: Well, what I am telling you, Mr. Graham, is this is just part of your problem which is that you are trying to represent yourself rather than allowing the Court to appoint a lawyer for you.

If we appoint a lawyer for you, that lawyer could get the discovery, could look at it and could tell you what's in there.

And you could make an intelligent decision about what to do about your

5

case.

THE DEFENDANT: I want to proceed to represent myself.

THE COURT: Well, that's a stupid decision.

It's just really foolish, and I am just going to be quite blunt about it.

There's very little I can do to assist you as long as you persist in representing yourself.

The court also had this exchange with standby counsel Semrau:

THE COURT:  Mr. Semrau, is there anything you think I could do that would persuade Mr. Graham to refrain from this folly of trying to represent himself?

MR. SEMRAU:  No, sir.

I think you have done what I have done, sir, which is explain to Mr. Graham that even a very intelligent person—clearly Mr. Graham is that—benefits from having counsel because counsel adds respectability and can advocate on someone's behalf.

And I think I have explained that, and I can only respect Mr. Graham's decision to do this.

I think he has been in a jury trial before represented by counsel, and apparently that's not what he wants.

So I assume he knows exactly what he is doing.  But I have given him the same advice that you have, Judge.

The problems Graham was having viewing discovery were addressed in the next status conference with the district court over four months later on December

6

6, 2007. Counsel for the government told the court:

> The decision was made that since there seemed to be a problem reading it on the computer we made hard copies of everything.
>
> We sent them through Mr. Semrau to Mr. Graham, and that was done several months ago.
>
> And so he should have everything and has had it for a while.

The court once again cautioned Graham about the dangers of representing himself, and Semrau confirmed that he had received the discovery from the government and had delivered it to Graham:

> THE COURT: Mr. Graham, are you still insisting upon representing yourself in this matter?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: I can't say too strongly how foolish I think that decision is in your case, but we have had this discussion several times. And if you are simply determined to represent yourself even though it would not be in your best interest, I can't stop you. You seem to be a very intelligent, articulate person. You've complied with all my directions. You have not been disruptive. And in the absence of those kind of factors, I can't prevent you from representing yourself.
>
> Although, I will tell you again as I have on numerous other occasions that that's not a good decision. It's a very, very bad decision.
>
> What do you have to say to that?
>
> THE DEFENDANT: Thank you, Your Honor.

7

THE COURT: Mr. Semrau, have you had any further discussions with Mr. Graham about how he intends to proceed as far as representing himself in this case?

MR. SEMRAU: No, sir, I haven't, not since our last meeting. [Government counsel] indicated I got discovery from her.

I did that. I haven't actually heard from Mr. Graham since I delivered discovery to him. But I understand he's got some questions for me, and I think he is going to call me. I have a phone number at my office that people who are in custody can call collect. So Mr. Graham has that ability to call me collect, and I can go visit him.

So I will continue to counsel with him. No, I haven't had any discussions with him, Judge.

Also at the December status conference, the court proposed a January 2008 trial date, and Graham once again sought to delay the proceedings, asking for a February date instead. The court once again accommodated Graham and set the trial for February 4, 2008. Graham assured the court, "I will be ready anytime in February." And once again, the court warned him:

THE COURT: Now, do you understand you have got the right to represent yourself or you have got the right to have a lawyer appointed for you; you don't have the right to both?

So if you still intend to represent yourself, when we start the trial Mr. Semrau is going to be gone.

He is not going to be here.

THE DEFENDANT: I understand that.

8

THE COURT: And you may well encounter situations where you may think you need the benefit of trained legal counsel. There's not going to be anybody here for you.

THE DEFENDANT: I understand that, Your Honor.

THE COURT: He is going to be gone. He is going to stay in the case as standby counsel in the hope that you will change your mind and allow him to represent you. But once we start the trial, you are going to be on your own and it'll be too late to change your mind then.

You understand that?

THE DEFENDANT: Yes, sir.

And yet again:

THE COURT: Mr. Graham, mortgage fraud cases are very complicated. They are very document intensive. [Government counsel] has had a lot of practice trying them, so she is very good at it. She knows what to do, knows how to present one of these cases very well.

There will be a lot of documents. And the way we handle one of these cases, I don't stop the trial once a jury is impaneled to give the Defendant or the defense attorney the time to examine the documents that are being introduced and discussed with the witnesses.

So you are going to have to be fully familiar with all the Government's documents before the trial of the case.

Are you prepared to do that?

THE DEFENDANT: Yes, sir.

The court emphasized that "the case will definitely, absent some extraordinary

9

circumstances, go forward on February the 4th."

At the January 11, 2008 status conference, Graham sought a third

continuance, and unsurprisingly the court was not receptive to that request:

> THE COURT: Mr. Graham, I warned you when we first talked about the difficulty you were going to have preparing at the jail that it was going to create problems for you and difficulties and that that's one of the disadvantages of trying to represent yourself rather than having Mr. Semrau represent you at the trial of the case.
>
> At the last pretrial conference, I was ready to put this case down for trial in January.
>
> The Government indicated they were ready to try the case in January. You asked for a February trial date.
>
> I gave it to you.
>
> And I am going to deny your request for any further postponement of it because I think you have been given a reasonable amount of time to prepare, and we need to get this case resolved.
>
> THE DEFENDANT: Okay.

Also at that conference, Graham assured the court that he would have someone

bring him street clothes for the trial:

> THE COURT:  I also said that you are going to be dressed in street clothes.
>
> Have you got somebody bringing your clothes?
>
> THE DEFENDANT: Yes, Your Honor.

And one last time, the court made sure that Graham intended to represent himself:

> THE COURT: All right. Again, Mr. Semrau, thank you for trying to assist the Court on this. And, Mr. Graham, you still insist on going forward representing yourself at trial?
>
> THE DEFENDANT: Yes, sir, Your Honor.
>
> THE COURT: It's not a good idea for the reasons I have discussed with you before. But if you are determined to do it, I am going to let you do it.
>
> THE DEFENDANT: Thank you.
>
> THE COURT: It's not that I am going to let you, it's that I have no choice in the matter. All right. If there's nothing further, then we will be adjourned.

Graham was brought to court for trial on February 4, 2008, and on the very day that the trial was scheduled to begin he told the court he was not ready to proceed. He refused to participate if the trial went forward. Standby counsel Semrau was contacted during a recess, and he came to court at noon.

On that same day—after Graham had been proceeding pro se for about a year-and-a-half—he told the court that he wanted to "[w]ithdraw [from] proceeding pro se" and that he was "hiring counsel right now." He identified Marcia Shein and Daniel Kane as lawyers he was considering hiring, and he stated that both of those lawyers had spoken with counsel for the government but had not

11

yet given him a price for their services. He asked for a ten-day continuance so that one of those lawyers could begin representing him. The court responded:

> Mr. Graham, this is too late for you to try to ask to delay the trial of this case the morning it's scheduled for trial when I have warned you all along that this case was going to go forward and that if you continued to insist on representing yourself that it was going to create problems for you and you were not going to be happy with the result.

Graham stated again that he refused to participate in the trial. When standby counsel Semrau arrived, he told the court that he "would like an opportunity to prepare for the trial properly, and [he] would need some time to do that." The court responded:

> Well, I understand the difficult position this puts you in, Mr. Semrau. And I am entirely sympathetic with the point of view that you have just expressed. But I find that by telling me for months that he was going to represent himself, refusing all my pleas that he reconsider that decision and allow you or some other attorney to represent him that Mr. Graham has waived his right to effective assistance of counsel; and I am going forward on that basis.

The district court thus appointed Semrau to serve as Graham's trial counsel but declined to grant an additional continuance. Semrau acknowledged that he did not "take argument with [the court's] point that Mr. Graham has certainly had every opportunity to either retain counsel or indicate that he wanted the assistance of counsel." Semrau contended, however, that the court was making a mistake by

12

having him act as counsel at that point in the proceedings. The court decided to go forward with the trial and reminded the parties that it had already informed them that the court would conduct voir dire. The court instructed Graham that he could propose follow-up questions if he chose to do so, and the court would consider them.

As for Graham's attire, he arrived in court dressed in an orange jail suit. Semrau stated that if Graham intended to be in the courtroom in the presence of the jury: "I would ask that he be taken out of his jail suit so that he can appear before the jury in street clothes. I have none for him, of course; but that's my request." The court responded that it had "asked about that at the last pretrial conference. And Mr. Graham told [the court] his family was going to be providing him with court clothes which again as in so many things didn't happen, and that's why he is in the jumpsuit." Semrau said: "Yes, sir. I do recall that. And, nevertheless, that's my request." The court denied the request. Neither Semrau nor Graham proposed any alternative way to get street clothes for Graham without delaying the start of the trial. During the trial Graham was not in leg irons. After a four-day trial, the jury returned a guilty verdict on all counts, and Graham was convicted.

III.

Graham contends the district court abused its discretion by denying his request for a continuance of the trial in order to obtain counsel of his choice. He argues that the district court erred by finding that he had waived his right to effective counsel. According to Graham, he was not obstructive and he did not deliberately manipulate the proceedings. He argues that even though it might appear as if, in order to delay the trial, he waited until the last minute to request counsel, he actually asked for a continuance a month before trial.

Graham fails to point out, however, that although he did ask the district court for yet another continuance a month before trial, he did not request counsel at that time. If he had, standby counsel would have been appointed to represent him, and he would not have faced the alleged problems he now argues occurred as a result of the district court's refusal to grant his last-minute request. Graham admits that he "certainly contributed to his dilemma by requesting counsel at the 11th hour and he certainly had time to prepare his own defense," but he asserts that "his continued requests for further information, more time, and ultimately counsel indicate that he realized his failure at self representation."

A.

"We review the disposition of requests for trial continuances for abuse of

14

discretion." United States v. Bowe, 221 F.3d 1183, 1189 (11th Cir. 2000). "The party denied the continuance must also show specific, substantial prejudice in some circumstances, such as when the claim is based on an alleged inadequate opportunity to prepare for trial." Id. at 1189 n.5; see also United States v. Verderame, 51 F.3d 249, 251 (11th Cir. 1995) (stating that to establish a due process violation, a defendant "must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice"). "Whether a denial of a request for continuance to obtain counsel is violative of the Sixth Amendment guarantee of the right to counsel must be resolved on a case by case basis, depending upon the particular circumstances, including the reasons for the request presented to the trial judge." United States v. Terry, 449 F.2d 727, 728 (5th Cir. 1971).[4]

"[T]he Supreme Court has made it clear that not every denial of a request for a continuance is a denial of due process." United States v. Baker, 432 F.3d 1189, 1248 (11th Cir. 2005). "The proper exercise of the trial court's discretion thus requires a delicate balance between the defendant's right to adequate representation by counsel of his choice and the general interest in the prompt and

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

15

efficient administration of justice." Id.

B.

In the present case the district court repeatedly warned Graham of the risks he was taking by choosing to proceed pro se. On more than one occasion the court specifically instructed him that discovery would be particularly difficult because he was incarcerated. Graham had about 18 months between his arraignment and the first day of the specially set trial. Hard copies of the discovery materials were provided to him because at the jail he had technical problems with viewing the CDs provided by the government. He was accommodated in every way possible. He had a lot of time and a lot of encouragement to consider and reconsider his decision to proceed pro se, but he did not announce a desire for counsel until the day set for trial, after the district court had already granted him two continuances.

Arguing that Graham had plenty of time to prepare for trial, the government relies on the reasoning in United States v. Terry, 449 F.2d 727 (5th Cir. 1971).[5] In Terry the defendant was arraigned and trial was set for six weeks later. Id. at 727. Counsel for the defense moved for a continuance about two weeks before trial, and that motion was denied. Id. at 727–28. On the day set for the trial to begin, the defendant showed up without counsel and asked for a continuance so that he could

---

[5]See note 4, supra.

16

retain new counsel because he had fired his lawyer. Id. at 728.

The government was prepared for trial and its witnesses were ready, but the court gave Terry 48 hours to retain new counsel. Id. When the case was called again two days later, Terry once again appeared without counsel and said that counsel did not have enough time to prepare. Id. He finally asked the court to appoint counsel for him, but there was no suggestion that he was indigent or lacked funds, and the court refused to appoint counsel. Id. Trial went forward, and Terry was unrepresented. Id. Our predecessor court held that Terry had been given a reasonable time to secure counsel of his choice and he was financially able to do so; as a result "his failure to retain counsel was properly treated by the court as a waiver of his right to counsel." Id. There was no abuse of discretion in the district court's refusal to grant a third continuance. Id. at 729.

Terry supports the conclusion that the district court did not err when it refused to grant Graham a third continuance. Almost a year-and-a-half before the trial began Semrau was appointed as Graham's standby counsel. Semrau attended all of the pre-trial hearings and conferences and even helped Graham obtain discovery documents. During all of that time and in the face of repeated cautionary statements from the court, Graham insisted on proceeding pro se.

Finally, on the first day of trial, Graham refused to go forward with the trial

17

and said he wanted to be represented by counsel but he wanted some other lawyer and not his standby counsel. The other lawyers Graham had contacted indicated that he had not retained them. It is unlikely that, starting from scratch, they could have prepared for trial during the 10-day continuance that Graham requested anyway.

A defendant cannot use the right to counsel as a means to manipulate the court and cause delay: "The right to assistance of counsel, cherished and fundamental though it be, may not be put to service as a means of delaying or trifling with the court." United States v. Fowler, 605 F.2d 181, 183 (5th Cir. 1979).[6] The sequence of events in this case strongly suggests that Graham was engaging in calculated maneuvers designed to force the court to delay his trial.

The denial of Graham's request for a continuance did not result in the loss of Graham's right to counsel. Cf. Terry, 449 F.2d at 728. Although Semrau was not as prepared for trial as he could have been had he been representing Graham from the beginning, any error in that regard was invited by Graham's manipulative conduct and his repeated insistence on representing himself in spite of the district court's admonitions against it. Cf. United States v. Ross, 131 F.3d 970, 988 (11th Cir. 1997) ("It is a cardinal rule of appellate review that a party may not challenge

---

[6]See note 4, supra.

18

as error a ruling or other trial proceeding invited by that party." (quotation marks omitted)). Furthermore, Graham does not mention anything specific that his counsel would have done differently if a continuance had been granted. The record indicates that, far from being ineffective, standby counsel Semrau capably and zealously represented Graham, particularly given that Graham's attempts to "delay[ ] or trifl[e] with the court," Fowler, 605 F.2d at 183, left Semrau with very little time to prepare for trial.

Even so, Graham argues that his request was not to obtain counsel of his choice or to get additional time to prepare his defense; instead, he asked for time to hire competent counsel who was prepared for trial. Before the trial began Graham had a year-and-a-half to decide to hire any lawyer he chose or to accept the services of his standby appointed counsel. If Graham failed to obtain what he considered to be ideal counsel, it is nobody's fault but his own. In Gandy v. Alabama, 569 F.2d 1318, 1323 (5th Cir. 1978), our predecessor court held: "Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his choice to prepare and conduct his defense. The constitutional mandate is satisfied so long as the accused is afforded a fair or reasonable opportunity to obtain particular counsel, and so long as there is no arbitrary action prohibiting the effective use of such counsel." Id. at 1323.

19

Eighteen months furnished more than a fair opportunity for Graham to obtain counsel and to prepare for trial. Instead, Graham insisted on proceeding pro se despite the district court's repeated warnings about the hazards of doing so.

Graham did more than contribute to his own situation; he created it. And the record shows that he intentionally created it. We will not permit Graham to game the system by asserting at this point in the proceedings that he was denied his right to competent counsel of his choice. The district court acted well within its discretion when it refused to grant Graham yet another continuance on the day set for the trial to begin.

IV.

Graham contends that his rights to due process were violated because he appeared at trial in an orange jail suit. It is a Fourteenth Amendment violation to "compel an accused to stand trial before a jury while dressed in identifiable prison clothes," but "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." Estelle v. Williams, 425 U.S. 501, 512–13, 96 S.Ct. 1691, 1697 (1976). If a constitutional error has occurred, we review to determine whether it is "harmless beyond a reasonable doubt." United States v. Harris, 703 F.2d 508, 512 (11th Cir. 1983).

20

Even though a defendant cannot be compelled to wear identifiable prison clothes before a jury at trial, see Estelle, 425 U.S. at 512–13, 96 S.Ct. at 1697, the Supreme Court has recognized that "it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." Id. at 608, 96 S. Ct. at 1695. Along those lines, the Seventh Circuit has observed: "[S]ome defendants may not care, or may believe that it confers a strategic advantage to appear as a captive. A litigant should not be permitted to seek this advantage (if advantage it is), and then set up the same point as a reason for reversal." Duarte v. United States, 81 F.3d 75, 77 (7th Cir. 1996).

Graham contends that his failure to bring his own clothes to trial is an insufficient basis for holding that he waived his constitutional rights. He asserts that the district court "ruled that Graham had essential[ly] assumed the onus of providing his own clothing when he assumed his own defense." Actually, Graham unequivocally told the court that he was obtaining street clothing and then offered no explanation whatsoever for appearing on the first day of trial in prison attire. Graham put on the burden of providing his own clothes by telling the court he would do it. Graham appeared in jail clothes before the jury as a result of his own conduct. He assured the court that someone would provide him with street clothes on the day of trial. When that day came he had no street clothes, no explanation

21

for why he lacked them, and no proposal for a way to get any without delaying the trial. Under the circumstances the district court properly refused to delay the trial. Graham created his own problem. Cf. SunAmerica Corp. v. Sun Life Assur. Co. of Can., 77 F.3d 1325, 1332 (11th Cir. 1996) (holding that when parties "make factual representations in the district court or in this Court that denial of a stay will moot the appeal, they may be estopped from arguing after the stay is denied that the appeal is not moot").

Not only that, but Graham's counsel also adeptly managed to use the orange jail suit for strategic advantage, incorporating a reference to it in his opening statement:

> Mr. Graham is wearing an orange suit. I have mentioned it, and it is unusual. But he is doing it very deliberately. He will explain to you why he is wearing an orange suit. It's because he is in jail, and he wants everybody to know about it. He is not happy about it. And he is going to testify, and he is going to be passionate. He is going to be thorough; and he is going to explain to you why it's unjust, why it's wrong and why he should not be in jail one day longer.

Graham chose to take the stand, and during his direct examination Graham's counsel asked him why he was wearing "an unusual suit for a trial." Graham testified:

> I am wearing it because of the things that the Government has done to me. And putting me in prison not only was illegal but it was—it just was ridiculous. And I am wearing it to let them know no matter what

22

suit I wear or however long I am going to be incarcerated I am going to never forget this for the rest of my life.

The jury did not learn that Graham was incarcerated simply by seeing him in a prison suit; Graham told the jury that he had been incarcerated since 2003 after pleading guilty to a drug offense in a separate case and that he was wearing the prison suit "because of the things that the Government ha[d] done to [him]." Graham's Fourteenth Amendment right to a fair trial was not violated by the fact that he wore prison attire instead of furnishing his own street clothes as he had promised the court he would do.

V.

Finally, Graham contends that the admission of "expert" testimony by lay witness and former attorney William Key violated his right to a fair trial. We generally review evidentiary decisions only for abuse of discretion. United States v. Brown, 415 F.3d 1257, 1264–65 (11th Cir. 2005). "As a practical matter, the abuse of discretion standard means that a district court has a range of choice." Id. at 1265. The government contends, however, that we should review only for plain error because Graham did not object on the grounds that Key was providing expert testimony even though he was a lay witness. See United States v. Hansen, 262 F.3d 1217, 1233–34 (11th Cir. 2001). Regardless of the applicable standard of

23

review, the record clearly shows that Key was testifying based on his own

personal knowledge as a former attorney who had engaged in fraudulent real estate

closings, and the district court did not err by admitting his testimony.

Key, a former real estate attorney who was serving time in prison, was

called as a witness for the government, and he testified about mortgage fraud.

After Graham objected to Key's testimony on lack of foundation grounds, the

government established that Key had personal knowledge based on his

participation in fraudulent real estate closings.[7]  Key testified that he had already

pleaded guilty to mortgage fraud in a case in Savannah and was serving time in

prison.  He testified that he also "did" fraudulent loans for one of Graham's co-

---

[7]Graham's three objections to Key's testimony were: (1) "He has no basis of knowledge for that testimony"; (2) "I object.  Can we be more — to relevance.  I don't know what we are talking about, what transaction specifically."; and (3) "He is not testifying from personal knowledge.  He is speculating at this point."

The first objection based on lack of foundation was overruled and was followed by Key's testimony that he was describing what he personally knew about based on his own involvement in fraudulent real estate closings.  Graham's second objection on relevance grounds was overruled and was followed by more of Key's testimony about his personal experience conducting fraudulent real estate closings.  He testified that one way to defraud the lender was for the buyer and seller to "agree on paper that the buyer put 10 percent earnest money down at the time of signing the sales contract when, in fact, the buyer never did really put down any money whatsoever."  According to Key, a copy of the check would be made and sent to the lender as proof, but the check was never cashed.  Key testified that he personally included that type of verification in loan files— knowing it was nothing more than a picture of a check—and that he did so on behalf of Phillip Hill and others in fraudulent real estate closings.  Graham's third objection was that Key was speculating instead of testifying based on his own personal knowledge.  The court instructed Key not to speculate, and the government asked him to recall specifically what had happened during transactions in which he was involved.

conspirators, Phillip Hill, in Atlanta.  When asked about the scope of his illegal

activity, he testified as follows:

> Well, I am an attorney and I do real estate transactions.  And I pled
> guilty to one count of conspiracy to commit wire fraud concerning a
> real estate transaction in Augusta, Georgia.  The scope of those
> transactions involved two mortgage brokers plus an independent real
> estate investor.  And they would buy houses, and they would fix up
> houses.  But they would overstate their repairs, and so they would put
> repair money into their pockets, and they would not actually use the
> repair money to repair the house.
>
> So when the developer went into bankruptcy, he defaulted on
> probably 20 mortgage loans that the mortgage brokers helped him get.

Key testified that he knew those loans were fraudulent at the time he was helping

others obtain them.  Then Key testified about specific transactions he did for

Phillip Hill with the knowledge that those deals were also fraudulent.

Key also testified about other specific fraudulent loan transactions, such as

one for Cheryl Denny.  Key stated that Graham was involved in the Denny deal

and had brought her to the closing.  He said that he had engaged in discussions

with Graham about the payments Denny was supposed to make.

Key also testified about a closing with Cortney Jackson.  Graham attended

that closing on behalf of the Alcindor-Williams Group.  At one point in his

testimony, Key spoke in more general terms about what was involved in

processing loans, but he did that in order to explain his actual conduct in these

transactions, and there was no objection from Graham. In fact, on cross-examination Graham's counsel asked Key some general questions about how the loan transactions worked. Counsel for the government objected based on lack of foundation, but her objection was overruled. Counsel for Graham also asked Key a "[t]echnical question: What is an option to purchase real estate?" Key provided an answer. Graham himself testified about real estate options when he took the stand in his own defense.[8]

---

[8]Graham had this to say about options:

I could take an option and I could get a juror or anyone to agree to a price and I could have a buyer to want to buy and I never have to take title to the property. I could flip the property with an option. It's done thousands of times a day on the stock market. I could have a call and a buyer.

Graham further explained options to the jury in this exchange with counsel on direct examination:

[Graham:] All right. Let's assume that somebody lived on Peachtree and was poor. The guy couldn't buy a meal. He could draw up an option on a piece of paper and go find a property that someone is losing that wants to preserve their credit. The property –

[Defense Counsel] Okay. Let's say that's me. Let's say that I have good credit but I lost my job and I own a house. Is that what you are talking about?

[Graham:] Yes.

[Defense Counsel:] Okay.

[Graham:] I would come to you and I'd say, Scott, how long have you had the house? He would say, well, you know, we have been in it for ten years or whatever. So what would happen is you built up something called equity. I say, Scott, you owe the mortgage company $300,000. I will give you $340,000. Would you take it? You say yeah. I say, Scott, because I live on the street I don't have

We have held that a witness who has particularized knowledge by virtue of his position in a certain company can give an opinion about the manner in which that company conducts its business, even if the witness is not qualified as an expert under Federal Rule of Evidence 702.  See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 (11th Cir. 2003) ("Tampa Bay's witnesses testified based upon their particularized knowledge garnered from years of experience within the field.").  Key provided some testimony about the kind of conduct he engaged in or personally witnessed during fraudulent mortgage transactions, and he testified about his personal knowledge concerning the conduct of other participants in the mortgage fraud scheme.  He did so based on his own experience.  The most general question Key answered was one posed by Graham's counsel on cross-examination about the definition of an option to purchase real

money to give you for this option.  Would you do it for the valuable consideration that I am going to go out there and sell it to somebody else? So you would say yeah. The option would give me actual rights to the title so that you couldn't sell it during that period, but technically I have —I don't own the property. So if then I would go and locate a buyer and I would go to the next guy and I'd say, hey, Scott's house is worth 600,000.  I'll take 550 for it. Would you buy it? He would say yes, so at the closing I make $200,000.

About Graham's own testimony, we have this to say:  "Defendants in criminal trials are not obliged to testify.  And, a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case."  United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995).  Furthermore, and "[m]ost important, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt."  Id.

estate.  Graham cannot complain about that testimony given that he asked for it, and in his own testimony he expounded upon how he believed options worked.[9]

The district court did not err in permitting Key to testify as a lay witness. Because the part of Key's testimony that was elicited by the government was based on his own personal knowledge of mortgage fraud, which he had acquired through his experience as a former real estate closing attorney who had engaged in fraudulent transactions of that nature, he did not have to be qualified as an expert under Rule 702.  See Tampa Bay Shipbuilding & Repair Co., 320 F.3d at 1222–23.

**AFFIRMED.**

---

[9]When Graham's counsel asked Key to testify about options, counsel for the government objected on the basis of relevancy, and Graham's counsel told the court: "I can connect this with Mr. Graham's testimony, Judge, because I believe that this transaction did, in fact, involve an option."  The district court overruled the government's objection.  Graham's counsel asked Key, "Can an option allow an individual to obtain a property and sell it if they don't own it?"  Key's answer was "No."  The jury was free to weigh that testimony against Graham's own, to credit the witness who seemed more credible, and to consider Graham's testimony, if disbelieved, as substantive evidence of his guilt.  See Brown, 53 F.3d at 314.

28