[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 9, 2012
JOHN LEY
CLERK

No. 11-10603
Non-Argument Calendar

_____

D.C. Docket No. 3:10-cr-00090-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ISMAEL B. RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 9, 2012)

Before TJOFLAT, EDMONDSON and BARKETT, Circuit Judges.

PER CURIAM:

Ismael Baca Rodriguez appeals his convictions for conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349, and mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. After careful review, we affirm.

## I. Background

This case arises from a life insurance claim that Rodriguez's wife filed with Modern Woodmen of America. From 2002 through 2006, Rodriguez secured four life insurance policies with Modern Woodmen, the face value of which totaled $2,000,000. On December 8, 2008, Rodriguez's wife, who was the primary beneficiary of the life insurance policies, mailed to Modern Woodmen a Mexican death certificate stating that Rodriguez had died on November 10, 2008. Modern Woodmen investigated the accuracy of the Mexican death certificate, and unable to verify it, denied Rodriguez's wife's claim in February 2009.

Over a year later, in August 2010, Rodriguez and his wife were taken into custody on federal arrest warrants and transported to an Immigration and Customs Enforcement (ICE) office. After being advised of and waiving his constitutional rights, Rodriguez agreed to speak with an ICE agent named Michael Nasca and told him the following story. In September 2008, he traveled to Mexico and, upon

2

exiting a convenience store there, he was hit on the head and knocked unconscious. When he woke up, he was lying on a dirt floor of a home in chains. His attackers wanted money and, after seeing his life insurance papers inside the bag he had been carrying with him, ordered him to call his wife for the money. Following their orders, he called his wife for the money but did not tell her he was kidnapped. When asked about the death certificate, Rodriguez initially reported that his family in Mexico received the death certificate and faxed it to his wife in the United States. But after Nasca informed him that the insurance company would have required the original document, Rodriguez changed his story and told Nasca that his family in Mexico received the document and somehow gave the original to his wife. Nasca then asked Rodriguez about why the kidnappers released him. Rodriguez first responded that the kidnappers never received any money from his wife and simply released him. But then he changed his story and said that his family in Mexico provided his wife with some money to give the kidnappers, and that the kidnappers then began arguing among themselves and that someone who was guarding him released him. Further, when asked about how and when he returned to the United States, Rodriguez responded that his wife drove to Mexico to pick him up in March 2009, and that when his wife reached the border, he exited the vehicle and walked undetected across a bridge as his wife

3

drove her car into the United States. He could not explain why he decided to walk across the border instead of driving with his family. Finally, he said that he did not report the kidnapping to authorities in the United States because he was fearful and did not trust anyone.

At trial, Nasca testified to the statements Rodriguez gave during the interview. Rodriguez did not testify, but his wife did, and she repeated much of the same kidnapping story, including that Rodriguez called her to ask her for some money; she began receiving threatening phone calls from kidnappers seeking ransom money for Rodriguez; she made several payments to the kidnappers with money Rodriguez's family in Mexico gave her; she went to Mexico in March 2009 to pick up Rodriguez; and Rodriguez exited the vehicle when they arrived at the border and walked across.[1] However, some parts of Rodriguez's wife's testimony contradicted aspects of Rodriguez's story. For instance, she testified that she saw Rodriguez in Mexico in October, while Rodriguez had said that he had been kidnapped in September; and she testified that she found an envelope containing the death certificate at a church where she was dropping off money for the kidnappers, while Rodriguez stated that his family gave her the death certificate.

---

[1] Rodriguez's wife was tried together with Rodriguez and was also convicted for conspiracy to commit mail fraud and mail fraud. After initially filing an appeal of her convictions, she filed a motion to dismiss the appeal, which this Court granted.

The government also presented border crossing records showing that Rodriguez reentered the United States from Mexico in late October 2008, contradicting Rodriguez's statements that he was kidnapped in September, and Nasca testified that there was no record of Rodriguez reentering the United States in March 2009. Rodriguez's brother, Ascension Rodriguez, also testified that he and Rodriguez went back to Mexico from the United States in late October 2008, that Rodriguez left in early November to travel to another part of Mexico, and that he did not see Rodriguez again until March 2009 in the United States. Finally, the government presented evidence that Rodriguez and his wife were having financial problems when the claims were filed.

Six days prior to trial, Rodriguez moved for a continuance to provide him with enough time to make a reasonable effort to have another brother who lived in Mexico, Jose Arturo, appear for trial as a defense witness. Rodriguez alleged that Arturo had knowledge of facts that would corroborate his kidnapping story. Specifically, Rodriguez anticipated that Jose would testify that he overheard telephone conversations between the wife and the kidnappers and that he assisted the wife in delivering payments to the kidnappers. Rodriguez's counsel claimed that his first opportunity to speak with Rodriguez's wife and hear her side of the story was at a recent joint defense meeting, and that as a result of the meeting, he

5

was able to set up a conference call with Arturo. Rodriguez's continuance motion, however, did not assert that Rodriguez first learned of Arturo's involvement from the joint defense meeting or the telephone conversation. The district court denied Rodriguez's motion.

The jury ultimately found Rodriguez guilty of conspiracy to commit mail fraud and mail fraud, and the district court sentenced him to 60 months' imprisonment.

## II. Discussion

Rodriguez raises two issues on appeal: first he argues that the district court abused its discretion by denying his motion to continue the trial; and second, he argues that the evidence was insufficient to sustain his convictions. We address each argument in turn.

### A. Denial of Continuance

A district court's denial of a motion to continue trial is reviewed for abuse of discretion. United States v. Graham, 643 F.3d 885, 893 (11th Cir. 2011). In instances where a defendant requests a continuance in order to locate and present a witness, "[a] movant must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable testimony would be tendered by the witness, that the witness is available and willing to testify, and that denial

6

of a continuance would materially prejudice the defendant." United States v. Darby, 744 F.2d 1508, 1521 n.6 (11th Cir. 1984) (citation omitted). Thus, we consider four factors in determining whether the denial of a continuance constitutes an abuse of discretion: (1) the diligence of the defense in interviewing the witness and procuring his testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the detail with which the defense was able to describe the witness's expected knowledge or testimony; and (4) the degree to which such testimony was expected to be favorable to the defendant, and the unique or cumulative nature of the testimony. United States v. Cross, 928 F.2d 1030, 1048 (11th Cir. 1991).

Here, Rodriguez failed to satisfy the due diligence prong. After counsel was appointed, he had over four weeks to prepare for trial, and yet offers no explanation for why that was not enough time to secure his brother's presence at trial. Further, his continuance motion did not indicate that he had just learned about Arturo's potential value as a witness; indeed, given that Arturo was his brother, we have no reason to doubt that he was already aware, well before the time he moved for a continuance, of the testimony Arturo could provide. As Rodriguez failed to show that he had exercised due diligence to obtain the attendance of Arturo, the district court did not abuse its discretion in denying his

7

motion to continue the trial.

B. Sufficiency of the Evidence

We review de novo challenges to the sufficiency of the evidence in criminal cases. United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). In determining whether sufficient evidence supports an appellant's convictions, we "must view the evidence in the light most favorable to the government and decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991). Furthermore, a "jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." Id. "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989).

We have defined the offense of mail fraud as consisting of:

(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme. The latter element is satisfied if the scheme's completion was dependent in some way upon information and documents passed through the mails and if the defendant acted with knowledge that the use of the mails would follow in the ordinary course of business or could reasonably be foreseen.

8

United States v. Smith, 934 F.2d 270, 271 (11th Cir. 1991). A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact intended to deceive another person out of money or property. United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009). To sustain the conspiracy conviction, the government is required to prove "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). Circumstantial evidence can be used to illustrate proof of knowledge of the scheme. Maxwell, 579 F.3d at 1299.

Rodriguez argues that there was insufficient evidence as to his involvement in the scheme. However, we find that the jury had adequate evidence to support Rodriguez's convictions. Based on the inconsistencies in his kidnapping story and the evidence contradicting it, a reasonable fact finder could have disbelieved it and found that he had constructed it to cover up his involvement in the scheme. Further, a reasonable fact finder could have inferred his knowledge of, and participation in, in the scheme from his disappearance just before the claim was filed and reemergence just after the claim was denied, his knowledge of the life insurance policies, the financial problems the Rodriguez's were facing, and his

admission that he contacted his wife to request money from the life insurance policies.  The jury's verdict, therefore, cannot be overturned.

**AFFIRMED.**