[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11878
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20496-JEM-1

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

versus

THOMAS PATRICK KEELAN,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 13, 2015)

Before HULL, BLACK and MELLOY,* Circuit Judges.

_____

* The Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

BLACK, Circuit Judge:

Thomas Patrick Keelan appeals the district court's sentence ordering restitution pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. Keelan argues the district court erred in ordering restitution because (1) 18 U.S.C. § 2422(b) is not a "crime of violence" as defined in 18 U.S.C. § 16(b); (2) the victim did not suffer a bodily injury; (3) a victim cannot recover mental health treatment expenses for a physical injury; and (4) Keelan's criminal offense did not proximately cause the victim's treatment expenses. Upon review, we affirm.[1]

## I. BACKGROUND

In the fall of 2009, J.S. started his sophomore year in high school at the Hebrew Academy in Miami Beach, Florida. Keelan was J.S.'s English teacher at the academy. J.S. was 15 years old, and Keelan was 51.

During adolescence, J.S. struggled to cope with several identity issues. As an Hispanic child born in Paraguay but adopted by Caucasian parents, J.S. worried about his place in America's racial fabric. Though his family devoutly practiced Orthodox Judaism, J.S. questioned his own religious convictions. J.S. also carried the extra burden of negotiating his sexual attraction toward men. To blunt his

---

[1] Keelan also raised the following three issues on appeal: (1) the district court erred in admitting J.S.'s testimony about the sex acts performed with Keelan, pornographic videos found at Keelan's home, and sex toys and pornographic videos found in Keelan's vehicle; (2) the district court erred in admitting the expert testimony of Dr. Terri Patterson; (3) and the district court erred in denying his sealed Federal Rule of Evidence 412(b) motion. We affirm these three issues without discussion.

2

emotional pain, J.S. began cutting himself—first at home and eventually during school hours.

Acting on a rumor circulating through the school, Keelan confronted J.S. after class about his cutting. Keelan offered words of comfort and encouraged J.S. to call or text him whenever he felt the urge to cut. At Keelan's suggestion, they began meeting each other during the school lunch hour to play chess in Keelan's classroom and discuss J.S.'s emerging identity issues.

One night Keelan texted J.S. and revealed he was at a gay bar on South Beach. J.S. told Keelan he believed he was gay. After this exchange, Keelan and J.S. began texting and talking each day for several hours, and Keelan began inserting sexual innuendo into their conversations. Keelan eventually asked J.S. if he wanted to have sex with him, and J.S. said yes.

At trial, Dr. Terri Patterson, an expert in child exploitation offenses, testified Keelan's interactions with J.S. were part of the "grooming process" typically employed by child predators. The six phases of grooming—identification, connection, information gathering, need fulfillment, sexual inhibition reduction, and preservation—were intended to establish Keelan's psychological control over J.S. Based on her review of the evidence, Dr. Patterson opined Keelan groomed J.S.

On February 14, 2010, Keelan picked up J.S. near the academy and drove J.S. to Keelan's apartment where they performed oral sex. They continued to regularly have oral and anal sex at Keelan's apartment after J.S. transferred to another high school. Upon Keelan's suggestion, they integrated sex toys, bondage, pornography, and sadomasochism into the relationship. Keelan blindfolded, tied, spanked, and whipped J.S.

Fearing others would discover this illicit sexual relationship, Keelan gave J.S. a burner cellphone. Keelan also taught J.S. to begin and end their written conversations with code words and expressions. Using this code, Keelan sought to ensure he was actually texting and emailing J.S., not a parent or law enforcement official.

During J.S.'s junior year of high school, Keelan moved to Virginia to take a new teaching job. Despite the long distance, Keelan selected, reserved, and paid for a room in a Hollywood, Florida hotel where he and J.S. had sex.

For reasons unknown to J.S., his parents began to suspect he was in an inappropriate relationship with Keelan. During his senior year of high school, J.S.'s parents enrolled him at a wilderness camp in Georgia and a residential treatment center in Texas. J.S. could not communicate with Keelan during this time. When Keelan returned to Florida, J.S. decided he wanted to cooperate with law enforcement officials.

4

A few months before his 18th birthday, J.S. made wiretapped phone calls to Keelan. Keelan revealed he kept one of J.S.'s old vocabulary tests in which J.S. scored a perfect 20 out of 20. Keelan kissed it "every day" and kept it as a talisman of J.S. During one call, Keelan admitted he was masturbating to the sound of J.S.'s voice and said he loved the way J.S. performed oral sex.

On June 1, 2012, Keelan and J.S. agreed to meet at the Hollywood Gateway Inn at Hollywood, Florida. Keelan reserved a room for seven nights with two adults and one king-sized bed. On June 15, 2012, Keelan began driving from Virginia to South Florida. On June 16, 2012, law enforcement officers surveilled Keelan stopping at the Lion's Den in Fort Pierce, Florida. While there, Keelan bought several sex toys before resuming his journey toward J.S.

Later that day, Keelan arrived at the hotel where officers arrested him and searched his car. The search uncovered a wide array of sex toys, bondage devices, lubricant, and pornographic DVDs featuring young adult males. Following his arrest, Keelan admitted to his sexual relationship with J.S.

After a three-day trial, a jury convicted Keelan of knowingly using means of interstate commerce to persuade, induce, or entice J.S. (a minor) to engage in sexual activity, in violation of 18 U.S.C. § 2422(b).[2] Keelan was convicted on one

---

[2] Though § 2422(b) also criminalizes knowingly coercing a minor to engage in sexual activity, the parties agreed to strike the word "coerced" from the indictment and jury instructions.

count of enticing a minor to engage in sexual activity from fall 2009 through summer 2011, and one count of attempting to commit the same offense from May 9 to June 16, 2012.

The district court sentenced Keelan to two concurrent prison terms of 200 months and a 25-year term of supervised release. Pursuant to 18 U.S.C. § 3664(d)(5), the district court found J.S.'s losses were not yet ascertainable and deferred a restitution ruling because the family of J.S. had not yet produced an accounting of his mental health treatment costs. The district court later referred the restitution issue to a magistrate judge because the paper record alone was insufficient to determine the appropriate amount of restitution.

The magistrate judge conducted a restitution hearing on August 7, 2013. The magistrate judge admitted into evidence several invoices from family therapists and psychological counselors. The invoices included fees for mental health treatment.

The magistrate judge entered a Report and Recommendation (R&R) recommending Keelan pay $104,886.05 pursuant to the MVRA, 18 U.S.C. § 3663A. The R&R concluded Keelan committed a crime of violence that resulted in bodily injury to the minor victim, and restitution was necessary for mental

---

The Government proceeded solely on the theory Keelan persuaded, induced, or enticed J.S. to engage in sexual activity.

6

healthcare to treat harm directly and proximately caused by Keelan's criminal offense. The R&R calculated the cost of treatment administered after February 14, 2010, the date on which Keelan first sexually abused J.S. Keelan filed a timely objection to the R&R.

The district court adopted the R&R, ordered Keelan to pay the amount specified therein, and incorporated that order into an amended judgment. Keelan timely filed a notice of appeal.

## II. STANDARD OF REVIEW

We review de novo "the legality of an order of restitution." *United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006). We review for clear error "factual findings underlying a restitution order." *Id.* at 1267.

## III. DISCUSSION

Keelan argues the district erroneously ordered restitution under the MVRA. The MVRA provides, *inter alia*, that a district court must order a defendant to pay restitution to the "victim" of a "crime of violence." *See* 18 U.S.C. § 3663A(a), (c). The term "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). If the offense results in "bodily injury" to the victim, the defendant must "pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and

7

psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment." *Id.* § 3663A(b)(2)(A).

Keelan proffers four reasons the district court erred in ordering restitution. We address each argument in turn.

## A.  Crime of Violence

Keelan argues 18 U.S.C. § 2422(b), which prohibits knowingly persuading, inducing, enticing, or coercing a minor to engage in sexual activity, is not a crime of violence as defined in 18 U.S.C. §16(b).[3]  Section 16(b) defines a crime of violence as any "offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Keelan admits his offense is a crime of violence under U.S.S.G. § 4B1.2(a)(2), but argues this Court has never decided whether § 2422(b) is also a crime of violence under § 16(b).  He contends § 16(b) is narrower than § 4B1.2(a)(2) because a substantial risk that physical force may be "used," as provided by § 16(b), is more limited than conduct that "presents" a serious potential risk of injury, as provided by § 4B1.2(a)(2).[4]

---

[3]  The Governments concedes § 16(a) is not applicable here because physical force is not an element of § 2422(b).

[4]  The Government argues our precedent mandates every crime of violence under U.S.S.G. § 4B1.2 is necessarily a crime of violence under 18 U.S.C. §16(b).  In *United States v. Rutherford*, 175 F.3d 899, 905 (11th Cir. 1999), we held a conviction for lewd assault under

The ultimate issue is one of first impression in this Court: whether 18 U.S.C. § 2442(b) is a "crime of violence" under 18 U.S.C. § 16(b).[5] To determine whether a conviction qualifies as a crime of violence under § 16(b), we apply a "categorical approach." *Dixon v. U.S. Attorney General*, 768 F.3d 1339, 1342–43 (11th Cir. 2014) (quotation omitted); *accord United States v. De la Fuente*, 353 F.3d 766, 770 (9th Cir. 2003) (applying categorical approach to § 16 in MVRA context). Under the categorical approach, a court must "look to the elements and the nature of the offense of conviction, rather than to the particular facts" of the defendant's record of conviction. *Leocal v. Ashcroft*, 543 U.S. 1, 7, 125 S. Ct. 377, 381 (2004).[6]

---

Florida Statute 800.04 qualifies as a "crime of violence" within the meaning of U.S.S.G. § 4B1.2. We reasoned there is no "substantial difference that requires a different decision between the definition of a crime of violence under 18 U.S.C. section 16 . . . and the definition of a crime of violence for career offender purposes under [U.S.S.G. § 4B1.2.]" *Id.* Later, in *United States v. Searcy*, 418 F.3d 1193, 1197 (11th Cir. 2005), we held § 2422(b) is a crime of violence pursuant to U.S.S.G. § 4B1.2. In doing so, we interpreted *Rutherford* as holding "a crime of violence determination for the purposes of 18 U.S.C. § 16 is indistinguishable from a determination made pursuant to U.S.S.G. § 4B1.1." *Id.*

We do not decide whether our precedent mandates the rule sought by the Government, but simply note our reasoning in *Rutherford* and *Searcy* is consistent with our holding in this opinion.

[5] The parties have not cited, and we have not found, case law from other circuits that have answered this precise issue.

[6] The parties did not brief whether § 2422(b) is a divisible statute susceptible to the "modified categorical approach" articulated in *Descamps v. United States*, 570 U.S. ___, 133 S. Ct. 2276, 2281–82 (2013). We do not answer this question because we can resolve this case without addressing the modified categorical approach.

In looking at the elements and nature of the offense, we must decide if only the ordinary violation of the statute at issue must present such a risk, or if all violations of the statute must present such a risk. The parties did not brief whether the "ordinary case" standard established in *James v. United States*, 550 U.S. 192, 208, 127 S. Ct. 1586, 1597 (2007), also applies to § 16(b). This gloss on the categorical approach requires a court to ask if the "ordinary," rather than the hypothetical and "unusual," violation of the statute at issue qualifies as a crime of violence. *Id.*; *see United States v. Chitwood*, 676 F.3d 971, 977 (11th Cir. 2012) ("[I]t is the 'ordinary' or 'generic' case that counts."). Despite the parties' failure to brief this question, we answer it because, in light of binding Supreme Court precedent, doing so is a necessary, logical step to determine if § 2422(b) is categorically a crime of violence under § 16(b). *See James*, 550 U.S. at 208, 127 S. Ct. at 1597 (using "ordinary case" standard when applying categorical approach).

All other circuits to examine the issue have held the proper inquiry under §16(b) is whether the conduct encompassed by the elements of the offense raises a substantial risk the defendant may use physical force in the "ordinary case", even though, at the margin, some violations of the statute may not raise such a risk. *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014) (quoting *James*, 550 U.S. at 208, 127 S. Ct. at 1597) (applying "ordinary case" standard to §16(b)

10

analysis) ; *United States v. Fish*, 758 F.3d 1, 10 (1st Cir. 2014) (same); *Rodriguez-Castellon v. Holder*, 733 F.3d 847, 853–55 (9th Cir. 2013) (same); *United States v. Echeverria-Gomez*, 627 F.3d 971, 978 (5th Cir. 2010) (same); *Van Don Nguyen v. Holder*, 571 F.3d 524, 530 (6th Cir. 2009) (same); *United States v. Sanchez-Garcia*, 501 F.3d 1208, 1213 (10th Cir. 2007) (same).  We follow this uniform rule and adopt the "ordinary case" standard for analyzing § 16(b).

Applying the categorical approach looking only to the ordinary case, we hold 18 U.S.C. § 2422(b) qualifies as a crime of violence under 18 U.S.C. § 16(b). Our precedent suggests this result.  Section 2422(b) criminalizes using or attempting[7] to use means of interstate commerce to knowingly "persuade[], induce[], entice[], or coerce[]" a minor to engage in "any sexual activity."  In *United States v. Searcy*, 418 F.3d 1193, 1197, 1198 (11th Cir. 2005), we held 18 U.S.C. § 2422(b) is a crime of violence under U.S.S.G. § 4B1.2(a)(2), which applies to "conduct that presents a serious potential risk of physical injury to another."  We found that "[i]n cases involving sex crimes against minors, . . . there is always a substantial risk that physical force will be used to ensure a child's compliance with an adult's sexual demands."  *Searcy*, 418 F.3d at 1197 (quoting *United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005)).

---

[7] Although one of Keelan's counts of conviction is an attempt offense, that fact does not preclude finding he committed a crime of violence under § 16(b).  The Supreme Court has held the analogous ACCA residual clause "does not by its terms exclude attempt offenses."  *James v. United States*, 550 U.S. 192, 201, 127 S. Ct. 1586, 1593 (2007).

11

For the same reason, § 2422(b) is a crime of violence under § 16(b).  Since the conduct encompassed by the elements of §2422(b) involves a sex crime against a minor, the ordinary or generic violation of § 2422(b) involves a substantial risk the defendant may use physical force in the course of committing the offense. Keelan therefore committed a crime of violence for which the district court could order restitution under the MVRA.

## B.  Bodily Injury

Keelan argues the evidence before the district court was insufficient to conclude J.S. suffered a "bodily injury" under 18 U.S.C. § 3663A(b)(2).  Keelan forfeited his right to seek review on this issue, however, because he failed to raise a specific objection to this factual finding in the R&R, and the district court adopted the R&R's factual finding in a short opinion.  *See* Fed. R. Crim. P. 59(a) ("Failure to object in accordance with this rule waives a party's right to review."); *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice.").  Keelan has failed to show plain error or manifest injustice, and has thus forfeited review of this issue.

## C.  Mental Health Treatment Costs

12

Keelan argues the district court erred in ordering restitution because there is no nexus between J.S.'s bodily injuries and his mental health treatment. Keelan asserts the MVRA limits restitution to medical services that treat only the bodily injury itself, not the psychological consequences flowing from that injury. We disagree.

Keelan's argument runs afoul of the MVRA's plain language. Under the MVRA, the defendant must "pay an amount equal to the cost of necessary medical and related professional services . . . relating to *physical, psychiatric, and psychological care, including nonmedical care and treatment*." 18 U.S.C. § 3663A(b)(2)(A) (emphasis added). The statutory language does not limit restitution only to care necessary to narrowly treat the physical manifestation of the victim's injury. The statute explicitly encompasses mental health treatment necessary to treat the psychological trauma of the victim. The plain language of the MVRA is buttressed by Congress's choice to define "bodily injury" in Title 18 as, *inter alia*, "impairment of . . . [a] mental faculty," *Id.* § 1365(h)(4); § 1515(a)(5). Surely Congress did not intend to define the impairment of a mental faculty as a bodily injury but then leave victims without the ability to recover the treatment costs for such an injury. The district court accordingly did not err in ordering restitution for J.S.'s mental health treatment.

D. *Proximate Cause*

13

Finally, Keelan argues J.S.'s bodily injury did not proximately cause his mental health treatment because J.S. suffered from several psychological problems prior to Keelan's sexual abuse. Keelan contends the evidence showing J.S. cut himself before the sexual relationship demonstrates the absence of proximate causation.

The district court did not clearly err in finding Keelan's offense "directly and proximately" caused J.S. to incur $104,886.05 in mental health expenses, *see* 18 U.S.C. § 3663A(a)(2). Contrary to Keelan's argument, we have held a "[d]efendant's conduct need not be the sole cause of the loss." *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (quotation omitted). Although other factors may have contributed to J.S.'s need for mental health treatment, the district court could still find proximate causation if the "causal connection between the conduct and the loss [was] not too attenuated (either factually or temporally)." *Id.* (quotation omitted).

The R&R adopted by the district court carefully analyzed the factual and temporal basis of J.S.'s mental health treatment. Although Dr. Patterson had testified Keelan began grooming J.S. in the fall of 2009, the magistrate judge excluded all costs prior to February 14, 2010—the day Keelan first sexually abused J.S.—finding there was "no doubt" Keelan proximately caused J.S.'s psychiatric

14

problems after that date.[8]  The chronology of the trial evidence firmly supported the conclusion that J.S.'s prior mental health problems were secondary to Keelan's manipulation and abuse.  J.S.'s mental well-being, according to his own trial testimony, deteriorated precipitously after Keelan sexually exploited him.  Moreover, numerous letters and affidavits submitted from J.S.'s medical providers stated Keelan's criminal conduct was the driving force necessitating J.S.'s treatment.  We cannot conclude the district court clearly erred in finding Keelan proximately caused J.S.'s mental health treatment expenses.

## IV.  CONCLUSION

In light of the foregoing reasons, we affirm Keelan's conviction and sentence.

**AFFIRMED.**

---

[8]  The Government has not cross-appealed the magistrate judge's exclusion of the treatment costs incurred prior to February 14, 2010 when Keelan groomed J.S.  We therefore do not address whether the magistrate judge could have found Keelan proximately caused the treatment costs during that time period.