# FOR PUBLICATION

## In the
## United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-10657

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

versus

LESLEY CHAPPELL GREEN,
  a.k.a. Grip,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:22-cr-00014-MTT-CHW-3

_____

_____

No. 24-11301

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

versus

PHILMON DESHAWN CHAMBERS,
  a.k.a. Dolla Phil,

                                                    *Defendant-Appellant.*

—————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:22-cr-00014-MTT-CHW-1

—————————————

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This kitchen-sink criminal appeal is about the trial, convictions, and sentences of two members of the Gangster Disciples. Lesley Green and Philmon Chambers were tried together, alongside another member of the gang. The jury found Green and Chambers guilty of participation in a conspiracy under the Racketeer Influenced and Corrupt Organizations Act. The jury also found Chambers guilty of three other crimes: (1) commission of a violent crime in aid of racketeering (murder); (2) use of a firearm during and in relation to a crime of violence; and (3) causing the death of a person through the use of a firearm. Both Green and Chambers were sentenced to life in prison—Chambers received two consecutive life sentences plus another consecutive term of imprisonment. Green challenges his conviction, and Chambers challenges his convictions and sentences. We affirm on all issues.

## I.

We divide our background into three parts. First, we explain the history, structure, and operations of the Gangster Disciples. Second, we describe Green's and Chambers's involvement in the gang and their crimes. Third, we explain the relevant procedural history that led to this appeal.

### A.

One prominent former member of the Gangster Disciples described it this way: "Ain't nothing normal about this mob . . . . We kill people for the littlest reasons, it is not normal." Doc. 361 at 146–47.

The Gangster Disciples formed in the late 1960s in Chicago with the merger of David Barksdale's "Devil's Disciples" and Larry Hoover's "Supreme Gangsters." After the death of Barksdale—whom the Gangster Disciples refers to as "King David"—Hoover has led the gang as its "Chairman" from various prisons since the 1970s. Today, the gang has a presence in thirty-seven to forty states, both inside and outside of prison. And, relevant to this appeal, the Gangster Disciples has operated in Georgia since the mid-1990s.

The Gangster Disciples operates under a "pyramid-like" structure. Below Hoover is the "board of directors," the members of which carry out Hoover's orders. Then, there is the governor of governors, who acts as an "in-between person . . . between the board and the governors." Each state has a governor position, and

most states have an assistant governor position as well. The Gangster Disciples further subdivides each state into regions governed by a "regent." Regions are, then, further subdivided into "decks" or "counts," which are headed by a first coordinator. At the bottom of the pyramid are outstanding members, who act as "foot soldiers."

The Gangster Disciples engages in a laundry list of crimes: murder, robbery, extortion, fraud, drug trafficking, carjacking, prostitution, and the like. Money from these crimes "funnel[s] up" through the "giant pyramid" of the gang. Some of the money from criminal activity is used for "aid & assistance," which includes providing funds to other members who are in hiding from law enforcement. The gang also maintains safehouses and other places members can use to flee from prosecution.

The Gangster Disciples also employs literature coordinators to ensure that its members are familiar with the knowledge, codes, and rules of the gang. The "Number One Rule of the gang" is "[s]ilence & secrecy." Doc. 360 at 145. That rule means that no Gangster Disciple "shall speak about the organization with anyone who is not a member of the organization." Doc. 362 at 197. Violating "Rule Number One" is "the most severe violation" of gang rules, and it can result in a gang-sanctioned punishment of death. Doc. 362 at 198; Doc. 360 at 146.

The Gangster Disciples uses "enforcers" to enforce the rules of the gang and to punish violators. As one might expect, the gang's enforcers are tasked with enforcing the rule of "silence & secrecy."

Doc. 360 at 150. According to a former national chief enforcer of the gang, "enforcers" are also "known as trigger pullers" because they "are willing to pull the trigger of a gun" for the gang. Doc. 361 at 103. Enforcers may also deal with external threats to the gang "if it come[s] down to it." *Id.* at 102.

*B.*

The event that sparked the criminal prosecutions against Green and Chambers was the murder of Walter Brown. Brown was a member of the Gangster Disciples who lived in Athens-Clarke County, Georgia. Brown was shot and killed after a drug deal turned sour. This appeal is not about Brown's murder; it is about the three murders that followed shortly thereafter.

Brown and Andrea Browner were fellow Gangster Disciples, as well as cousins. The day after Brown's murder, Browner posted on her Facebook page: "Yo justice will be served. I love you!" Doc. 341-9 at 1; Doc. 362 at 235–36. The text of Browner's post was over a background that featured blue six-point stars, a primary symbol of the Ganger Disciples. That symbol, also known as a "Star of David," pays homage to Barksdale.

The Gangster Disciples "see themselves as their own nation with their own justice." Doc. 362 at 236. By "justice," Browner did not mean seeking justice in a courtroom. She meant retaliation, and "the required retaliation for the murder of a Gangster Disciple" is "[m]ore murder." Doc. 361 at 127.

At that time, Chambers was Browner's boyfriend, as well as the Gangster Disciples's chief enforcer for the state of Georgia. After Brown's murder, Chambers and Browner started looking for the shooter. But if an enforcer cannot find a person responsible for the murder of a Gangster Disciple, the family of the suspected killer is "not off limits." Doc. 361 at 128.

Four days after Brown's murder, Chambers and Browner found a suitable target. Browner, who made money as a prostitute, met Rodriguez Rucker at a hotel for sex. During their meeting, Browner discovered that Rucker was the suspected shooter's cousin. Browner texted Chambers, "[g]et here so u can follow him." Doc. 359 at 25–26; Doc. 341-325 at 99. Browner knew that Chambers had a gun, because earlier that day he texted her that he had a "tool." Doc. 359 at 20–21.

Joshua Jackson was also at the hotel that day. Jackson was a Gangster Disciple who, according to his father, had a mild mental disability. Jackson had a "talkative" personality, and members of the Gangster Disciples distrusted him because they had come to believe that Jackson had "snitched" on the gang in the past. Browner texted Chambers: "Don't park where Josh can see[,]" followed by, "He[] talk too damn much." Doc. 359 at 26; Doc. 341-325 at 99.

Chambers arrived at the hotel in his black truck, and he waited for Rucker to leave. A string of surveillance footage showed that Chambers followed Rucker to his home. While Chambers was stalking Rucker, Browner called Brown's widow and asked her to

remove their signatures from the wake attendance log that they had just signed that day. Browner also told Brown's widow that they would not be able to make it to Brown's funeral.

Residents on Rucker's street heard gunshots around 3 p.m., and they saw a black truck speeding away from the scene. Rucker was lying dead in a neighbor's front yard. He had been shot four times in the back. Police found Rucker's phone at the crime scene, and when they reviewed its contents, they found his messages setting up the meeting with Browner for paid sex.

Browner and Chambers fled to a Gangster Disciples safehouse. Police tracked the couple using cell phone location data, and they arrested Browner the day after Rucker's murder on a warrant for prostitution.

Police searched Browner's car and found cell phones, 70 grams of cocaine, and about 100 grams of a cutting agent. They also found a briefcase that belonged to Chambers that contained Gangster Disciples literature, including a handwritten list titled "E Team Jan. 2016." The E Team list named fifteen Gangster Disciples, including Chambers and Green. One Gangster Disciple testified that he, Chambers, and Green all served on the G-Side enforcement team, and Chambers was the leader of that team.

Chambers suspected that Jackson had "snitched" and told the police that he was Rucker's killer. So Chambers told Green that he needed to "handle the business . . . of the Nation"—the Gangster Disciples—and deal with the snitch. *See* Doc. 360 at 181–82.

So Green gathered a fellow Gangster Disciple and another man who was on friendly terms with the gang. Green told them they were going to "hit a lick," meaning commit a theft. Green arranged that his group of three would meet Jackson and Derrick Ruff at a nearby Walmart. The five men smoked marijuana together in Green's Jeep, and Green told them that he knew where they could steal some marijuana from a storage unit and send "aid & assistance" to Chambers in Texas. Nothing about Green's plan was out of the ordinary; Green and his group had broken into commercial storage units multiple times before.

The group snuck into the storage-unit facility through the fence gate, and broke into a storage unit and all went inside. Once inside, Green pulled out a pistol and shot Jackson twice in the head. Ruff panicked, grabbed one of the other men, and begged Green not to kill him. Green ordered the other man to move, and once he complied, Green shot Ruff too.

Right after Green killed Jackson and Ruff, he started "looking for their phones" because he had texted them to set up the meeting. Doc. 360 at 180. When the other men asked Green why he did not tell them about his plan to kill Jackson and Ruff, Green told them that he "couldn't mess it up." *Id.* at 184. Chambers tried to call Green that same night, but Green had turned his phone off. Green cancelled service for his phone number the next day.

Police arrested Chambers about three months later in Texas after wiretapped phone calls disclosed his plot to move Jackson's and Ruff's bodies from the storage unit to a landfill. While

Chambers was in detention, jail officials had come to believe that he was trying to smuggle contraband into the jail, so they started monitoring his mail. Jail officials intercepted a letter from Chambers in which he explained how he had been reading discovery material and was concerned that members of the Gangster Disciples were cooperating with law enforcement. In his letter, Chambers complained that "[i]f they would've stuck 2 da script in case things went bad, then Grip [Green] . . . would be home. I would still be here tho'. And J.T. too cuz da phone taps, but J.T. neva actually committed a crime . . . ." Doc. 341-239 at 2. Chambers continued, "Better yet if CLEAR instructions would've been followed by Grip [Green], then it wouldn't even be a case! They neva would've placed him at da scene meeting dem n[***]az. . . . He didn't tell folks dem nothing about dis. Not even da onez ridin' wit' him." *Id.* Chambers was frustrated because Green "didn't tell dem da instructions *he* was given. He just took it upon himself 2 do it his way." *Id.*

## C.

Chambers tried his best to delay the proceedings against him. Chambers chose to represent himself at his arraignment, and a magistrate judge held a *Faretta* hearing to ensure that his decision was voluntary and intelligent. The district court appointed standby counsel.

At Chambers's first pretrial conference, he made "sovereign citizen arguments" and again told the district court that he had "made the decision to not take an attorney because [he was] not

subject to the Court, but rather subject to treaty." Doc. 119 at 8–9. The district court informed Chambers that he had stand-by counsel, to which Chambers responded, "She won't be needed. I do not consent to any of your attorneys. I'm not a ward of your state." *Id.* at 10–11. Chambers's stand-by counsel told the district court that she had offered her services to him, and that he had "asked [her] to have no contact with him." *Id.* at 19. She stated that she did not plan to contact him "unless he reaches out to me." *Id.* The district court agreed with that plan.

At the second pretrial conference, Chambers refused to follow the district court's instructions and again stated that he did not consent to the district court's jurisdiction. The district court removed Chambers from the hearing because of his repeated disruptions.

At the final pretrial conference, Chambers informed the district court that the "Moorish Science Temple of America" was sending "someone" to represent him. Doc. 466 at 7. It was unclear whether this hypothetical representative was an attorney. Chambers asked the district court to continue the trial, and the district court denied that request. The district court explained to Chambers: "You have picked the path that you are on. You cannot come in here less than a week before trial and seek to delay the proceedings because you now wish to retain counsel or have somebody represent you." *Id.* at 8. The district court further observed that "having, again, gone down this path, you cannot at the last minute throw up a roadblock. So, there will be no continuance." *Id.* at 9.

The district court again had to remove Chambers from the court-room after he continued to disrupt the proceedings. On his way out, Chambers said, "let the record reflect I do not consent to being represented by any of your attorneys." *Id.* at 16.

After the pretrial conference ended, the district court re-turned Chambers to the courtroom for an *ex parte* conference that Chambers had requested. Chambers again asked for a continuance, and again, the district court made it clear that it would "not con-tinue this trial." *Id.* at 106–08. The district court told Chambers that he had made the decision to proceed in the way he had chosen, and that it had explained to him "the potential consequences of that decision." *Id.* at 108–09. The district court continued, "And now that we're on the verge of trial, I am not going to upset that because you may be having second thoughts or you may feel you need more time." *Id.* at 109. The district court informed Chambers that "counsel is free to enter an appearance in this case, but they will have to understand that their entry in the case will not delay the case." *Id.* The next day, the district court relieved Chambers's stand-by counsel due to a conflict of interest and appointed new stand-by counsel for Chambers.

On the morning of jury selection, Chambers maintained that he did not want to be represented. Chambers's new stand-by counsel felt it was his "obligation to ask" the district court "for a week or some amount of time" to prepare. Doc. 357 at 76. The district court responded to Chambers's stand-by counsel: "[Y]ou

are free to do what you feel like you need to do in your role as stand-by counsel, but there will be no delay." *Id.* at 77.

The next day, just before opening statements, Chambers asked the district court to appoint his stand-by counsel as trial counsel. Chambers's counsel renewed his request for a continuance to prepare for the case. The district court saw two possible options: "[W]e release this jury and we start over with a trial setting or we start the trial today." Doc. 358 at 27. Green opposed any continuance, and the government opposed any severance. The district court found that Chambers had waged a "clear campaign . . . to delay the proceedings." *Id.* at 29–30. After balancing the interests of all parties, the district court found it was "clear . . . that Mr. Chambers ha[d] in a calculated way operated to delay and disrupt these proceedings." *Id.* at 30. Accordingly, the district court chose the "one course of action that [was] appropriate under the circumstances, and that [was] to proceed with the trial." *Id.*

The government presented its case against Green, Chambers, and Browner over the course of a two-and-a-half-week trial. Neither Green nor Chambers elected to testify or present evidence.

The jury convicted Green of participation in a RICO conspiracy (18 U.S.C. § 1962(d)), the only count charged against him. The jury also found that Green either murdered or unlawfully aided, abetted, advised, encouraged, or counseled another to murder Jackson and Ruff.

The jury convicted Chambers on all counts. As to count one, the jury found that Chambers participated in a RICO conspiracy

(18 U.S.C. § 1962(d)), and that he murdered Rucker as part of that conspiracy. The jury also found that he aided, abetted, advised, encouraged, or counseled another to murder Jackson and Ruff as part of the conspiracy. As to count two, the jury found that Chambers was guilty of violent crime in aid of racketeering, specifically VICAR murder (18 U.S.C. § 1959(a)(1)). As to count three, the jury found that Chambers was guilty of using or carrying a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)). And as to count four, the jury found that Chambers was guilty of causing the death of a person through the use of a firearm (18 U.S.C. § 924(j)(1)).

Chambers moved for a new trial, in part because the district court denied his motion for a continuance. The district court held a hearing on the motion, and the government introduced evidence of a jailhouse phone call between Chambers and his father the night before opening statements. In that call, Chambers's father coached Chambers to ask the district court the following morning to appoint his stand-by counsel as counsel. Chambers's father explained to him that action would delay the case, or, if the district court denied his request, it might give Chambers grounds to have the case thrown out down the road. The district court concluded that Chambers's predicament "was entirely of his own making. It was clear that . . . his calculation for months had been to delay, delay, delay." Doc. 479 at 38. So the district court denied Chambers's motion for a new trial.

In the same hearing, the district court addressed a merger issue for sentencing purposes. The government had moved to merge Browner's and Chambers's convictions on count four (section 924(j)(1)) into their convictions on count two (section 1959(a)(1)). The government asked the district court to merge the convictions in that direction because Congress decided that the only appropriate penalties for a conviction of VICAR murder (count two) were life imprisonment or death. Browner, but not Chambers, objected. She argued that, based on her actions, the district court should instead merge count two into count four, and have the discretion to sentence her to a term of imprisonment less than life. The district court initially agreed with Browner's argument and stated that it would merge count two into count four for both Browner and Chambers.

After a short recess, the government raised the possibility that, if the district court merged count two into count four, sentencing Chambers on counts three (section 924(c)(1)(A)) and four might raise double jeopardy concerns. The government proposed two options for the district court to consider. One option was for the district court to merge count two into count four, vacate count three, and sentence Chambers on counts one and four. The other option was for the district court to revisit its earlier decision, merge count four into count two, and sentence Chambers on counts one, two, and three.

The district court acknowledged that the question of how to handle the merging of convictions was a matter of discretion. So it

considered the specific factual circumstances underlying Chambers's convictions and also took into account the effect of merger on Chambers's punishment. Ultimately, the district court opted to accept the second option and merged Chambers's conviction on count four into his conviction on count two.

The district court sentenced Green to a term of life imprisonment. The district court sentenced Chambers to two consecutive terms of life imprisonment on counts one and two, and a consecutive term of 120 months' imprisonment on count three.

At a later restitution hearing, the government presented evidence that Derrick Ruff Sr., the father of victim Ruff, lost $952.80 in income when he missed work to attend court proceedings against Chambers. Chambers objected on the grounds that Ruff Sr. was not a "victim" under the Mandatory Victims Restitution Act, but the district court overruled that objection

Green, Chambers, and Browner appealed. We dismissed Browner's appeal for want of prosecution. This is Green's and Chambers's consolidated appeal.

## II.

Several standards of review govern this consolidated appeal. As to the issues Green raises, we review a preserved challenge to the sufficiency of the evidence *de novo*. *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015). "We examine whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the

fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* (citation modified). And we will affirm the conviction "unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (citation modified).

"When reviewing the denial of a motion to suppress wiretapped communications, we review legal conclusions *de novo* and factual findings for clear error." *United States v. Caldwell*, 81 F.4th 1160, 1175 (11th Cir. 2023). We review preserved challenges to a district court's evidentiary rulings for abuse of discretion, and review underlying factual findings for clear error. *United States v. Dickerson*, 248 F.3d 1036, 1046 (11th Cir. 2001). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004).

As to the issues Chambers raises, we review a district court's "disposition of requests for trial continuances for abuse of discretion." *United States v. Graham*, 643 F.3d 885, 893 (11th Cir. 2011) (citation modified). We ordinarily review a district court's decision to empanel an anonymous jury for an abuse of discretion, but we review unpreserved challenges to a district court's precautionary explanation to an anonymous jury for plain error. *See United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1033 n.24, 1035 (11th Cir. 2005). We review unpreserved challenges to a district court's shackling determination for plain error. *United States v. Ahmed*, 73 F.4th 1363,

1373 (11th Cir. 2023). "Plain error requires (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (citation modified). "And we may notice the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation modified).

We review an argument of cumulative error *de novo*. *United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021). "The cumulative-error doctrine calls for reversal of a conviction if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *Id.*

We review preserved sentencing errors for harmless error. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005). Under the harmless error standard, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). Finally, we review "the legality of an order of restitution" *de novo*. *United States v. Keelan*, 786 F.3d 865, 869 (11th Cir. 2015) (citation modified).

### III.

Green presents four arguments challenging his conviction. Chambers presents four arguments challenging his convictions, two arguments challenging his sentencing, and one challenging the restitution award entered against him. We address each in turn.

*A.*

1.

Green argues that the government failed to prove all the elements underlying his RICO conspiracy conviction. According to Green, although the government may have established that he murdered Jackson and Ruff, it did not establish that he murdered them "in furtherance of the G-side Gangster Disciples . . . enterprise." Green's Br. at 23–24. Green made this same argument that slices and dices the Gangster Disciples into independent geographic territories to the jury, and the jury rejected it. So do we.

"To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that the defendants objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (citation modified). An "enterprise need not be a legal entity such as a corporation or partnership; it may also be a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998) (citation modified). The government must establish "the vital element of agreeing to commit the predicate acts," but if it supplies "proof of the commission of racketeering activity, the inference of an agreement to do so is unmistakable." *United States v. Martino*, 648 F.2d 367, 383 (5th Cir. June 1981) (citation modified).

Here, like one of the appellants in *Starrett*, Green argues that the government's evidence connects him only to a local chapter of a national gang, but that it does not provide a nexus between the murders and the national racketeering enterprise. *See Starrett*, 55 F.3d at 1547–48. The evidence, however, is sufficient for a rational jury to have concluded otherwise. At trial, the government presented evidence that established that the Gangster Disciples is a national organization that operates under a "pyramid-like" structure. Green was a member of the national gang, and he furthered the Gangster Disciples enterprise by holding the position of "enforcer," a position of authority within the enterprise. Green killed Jackson and Ruff to enforce "silence & secrecy," Rule Number One of the Gangster Disciples. Green committed those murders after Chambers, the enforcement team leader, told him that he needed to go "handle the business . . . of the Nation," meaning the Gangster Disciples.

Green also contends that he murdered Jackson and Ruff "in furtherance of Chambers'[s] personal motivations," not in furtherance of the Gangster Disciples enterprise. Green's Br. at 23. The government supplied plenty of evidence—Green's enforcer position, the rule against "snitching," and Chambers telling Green that he needed to go "handle the business . . . of the Nation"—to allow a reasonable jury to reject that view. We reject it as well, because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (citation modified).

2.

Green next argues that the government introduced illegally obtained wiretap evidence over his motion to suppress, and that this evidence prejudiced him. The government complied with federal and Georgia state law in intercepting the phone calls, and there was no error in their admission.

"Title III of the Omnibus Crime Control and Safe Streets Act regulates the interception of wire, oral, and electronic communications." *United States v. Stowers*, 32 F.4th 1054, 1063 (11th Cir. 2022) (citation modified). The Act allows "[t]he principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to" apply "to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications." 18 U.S.C. § 2516(2). A state judge "may grant" the order so long as the order complies with 18 U.S.C. § 2518 and applicable state law. *Id.* If the judge wishes to approve a wiretap order, the judge "may enter an ex parte order" approving the application "within the territorial jurisdiction of the court in which the judge is sitting." 18 U.S.C. § 2518(3).

We look to state law to determine "[t]he territorial jurisdiction over which a court has authority." *Stowers*, 32 F.4th at 1069 (citation modified). Georgia law allows the Attorney General or "the district attorney having jurisdiction over prosecution of the crime under investigation" to submit a sworn "written application"

to "a judge of superior court having jurisdiction over the crime under investigation" for a wiretap order. Ga. Code Ann. § 16-11-64(c). Georgia law is in accord with the federal law, as any wiretap order must comply with "18 U.S.C. Chapter 119"—Title III. *Id.* Further, Georgia law provides that any wiretap order "shall have state-wide application and interception of communications shall be permitted in any location in this state." *Id.* Read together, then, federal law and Georgia law allow Georgia state judges to grant wiretap orders that apply across the state.

The wiretap order here allowed for interception of communications at any location in Georgia. But Green argues that the wiretapped calls that the government introduced as evidence were not "intercepted" within Georgia. Green argues that an FBI agent's testimony at trial established that the relevant calls were first intercepted in the telephone company's switch (at an unknown location), and then the audio for 4G or 5G calls was sent to Quantico, Virginia, and only then was the audio forwarded to Athens-Clarke County, Georgia. All agree that law enforcement first listened to the relevant phone calls in Athens-Clarke County, Georgia.

That last fact is dispositive. Under Title III, "'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). And "[u]nder Georgia law and consistent with Title III," an "'interception' occurs both at the 'listening post' where the call is heard and at the location of the targeted phone when it makes or receives a

call." *Stowers*, 32 F.4th at 1070 (quoting *Luangkhot v. State*, 736 S.E.2d 397, 400 (Ga. 2013)). All of our sister circuits that have considered the question have reached the same conclusion we reach today: an interception occurs both where the wiretapped phone is located and where a listener first hears the communications. *See, e.g.*, *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992); *United States v. Jackson*, 849 F.3d 540, 551–52 (3d Cir. 2017); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996); *United States v. Ramirez*, 112 F.3d 849, 852 (7th Cir. 1997); *United States v. Henley*, 766 F.3d 893, 911–12 (8th Cir. 2014); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); *United States v. Dahda*, 853 F.3d 1101, 1112 (10th Cir. 2017), *aff'd*, 584 U.S. 440 (2018); *United States v. Cano-Flores*, 796 F.3d 83, 86–87 (D.C. Cir. 2015).

So it makes no difference that data first traveled through the telephone switch in parts unknown and then traveled to Virginia before making its way to Georgia; because the calls were first listened to in Georgia, they were intercepted in Georgia. That interception complied with the wiretap order, and thus the district court did not err by admitting the calls as evidence.

3.

Having addressed the wiretap, we turn to Green's hearsay argument. Specifically, Green argues that the government unlawfully introduced Chambers's jailhouse letter in violation of the rule against admission of hearsay evidence and his Confrontation Clause rights under the Sixth Amendment. The district court was within its discretion to admit the jailhouse letter as a co-conspirator

statement, and its underlying factual findings on the issue of whether Green withdrew from the conspiracy were not clearly erroneous. And under our precedent, Chambers's statements in the letter were not testimonial, so there was no Confrontation Clause problem with their admission.

Under the Federal Rules of Evidence, a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E); *see also United States v. Diaz*, 248 F.3d 1065, 1087 (11th Cir. 2001). To introduce a coconspirator statement under Rule 801(d)(2)(E), "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." *United States v. Underwood*, 446 F.3d 1340, 1345–46 (11th Cir. 2006).

Green contends that the government failed to establish the third element—that Chambers's jailhouse letter was written during the course of the conspiracy. Green argues that, by the time Chambers had written the letter, Green had already withdrawn from the conspiracy. "Withdrawal . . . is an affirmative defense, which the defendant has the burden of proving." *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987). And "[t]he defendant's burden in this regard is substantial." *Id.* To establish withdrawal from a conspiracy, a defendant must prove "(1) that he has taken affirmative steps, inconsistent with the objectives of the

conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities." *Starrett*, 55 F.3d at 1550. Further, "[t]he conspirator's break with the other conspirators . . . must be both clean and permanent." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999).

Green argues that he withdrew from the conspiracy. The district court's conclusion that he did not withdraw is based on factual determinations, which we review for clear error. *See Bourjaily v. United States,* 483 U.S. 171, 175 (1987); *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1317 (11th Cir. 2013); Fed. R. Evid. 104. And we must affirm the district court's factual findings unless "a review of the entire record leaves us with the definite and firm conviction that a mistake has been committed." *Cuenca v. Rojas*, 99 F.4th 1344, 1350 (11th Cir. 2024) (quoting *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357 (11th Cir. 2020)).

Green nonetheless argues that the district court's finding that he did not withdraw from the conspiracy was clearly erroneous for three reasons. But his arguments fall well short of convincing us that the district court was mistaken. *See id.*

First, he says that he was already in custody at the time Chambers wrote his jailhouse letter, so the government cannot contend that he was furthering the conspiracy. But "neither arrest nor incarceration automatically triggers withdrawal from a conspiracy." *United States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir.

1991). Indeed, neither arrest nor confinement does anything to advance a defendant's withdrawal argument because neither action is affirmative, nor does it communicate anything to the other members of the conspiracy.

Second, Green contends that after his arrest and confinement, he could not further contribute to Chambers's activities, meaning that he had effectively withdrawn from the conspiracy. But "[a] mere cessation of activity in the conspiracy is not" enough. *Finestone*, 816 F.2d at 589. So a conspirator who sits idly by—even in a jail cell—has not withdrawn.

Third, Green says that he "plainly met with the [g]overnment to share information regarding the prior activities of the parties that defeated the objectives of Chambers'[s] conspiracy." Green's Br. at 40. But meeting with and supplying the government with information does not automatically "defeat or disavow the purpose of the conspiracy." *United States v. Rosenthal*, 793 F.2d 1214, 1244 (11th Cir. 1986). Here, the district court found that Green's asserted "break" from the conspiracy fell short of the "clean and permanent" break that is necessary to withdraw from a conspiracy, and we see no clear error in that finding. *Morton's Mkt.*, 198 F.3d at 839.

The district court acknowledged that Green had made a "largely true" proffer to the government. Critically, though, Green's proffer was not "completely true in perhaps its most critical respect, and that is the killing of Ruff and Jackson; specifically . . . who killed them and how they were killed." Doc. 367 at 215.

Green could not have "disclosed the scheme to law enforcement authorities" if he actively deceived or hid a critical element of the scheme from law enforcement authorities. *Starrett*, 55 F.3d at 1550.

The district court also found it relevant that after Green made a less-than-completely-true proffer to the government, he "signed [a] statement with his co-conspirators disavowing" the proffer he had made. Doc. 367 at 215. To be sure, the district court acknowledged that "evidence of duress" existed as to Green's disavowal statement. *Id.* But that did not "change the fact that the statement was made." *Id.* Further, Green supplied no evidence "suggest[ing] that [he] communicated any disavowal of the conspirator objectives, including the cover-up of the conspiracy, in a manner reasonably calculated to reach his co-conspirators." *Id.* On this record, we cannot say that the district court's factual finding that Green failed to withdraw from the conspiracy was clearly erroneous. Because we agree with the district court's factual finding that Green did not withdraw from the conspiracy, that means that Green and Chambers were co-conspirators at the time Chambers wrote the jailhouse letter. Accordingly, the district court acted within its discretion by admitting Chambers's jailhouse letter as a co-conspirator statement under Rule 801(d)(2)(E).

We also see no issue with the jailhouse letter's admission under the Confrontation Clause. "The Confrontation Clause prohibits the admission of only 'testimonial' hearsay—'solemn declarations or affirmations made for the purpose of establishing or proving some fact.'" *United States v. Brown*, 125 F.4th 1043, 1056

(11th Cir. 2025) (citation modified) (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)). "Statements are testimonial if in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* (citation modified).

A co-conspirator's statement admitted under Rule 801(d)(2)(E) poses no Confrontation Clause issue if the statement was "not made under circumstances which would have led [the declarant] reasonably to believe that his statement would be available for use at a later trial." *Underwood*, 446 F.3d at 1347. Just so here. Chambers's jailhouse letter to a friend about his concerns that Gangster Disciples were violating the "silence & secrecy" rule does not fall within "the core class of 'testimonial' statements," such as "ex parte in-court testimony or its functional equivalent," "extrajudicial statements contained in formalized testimonial materials," or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (citation modified). Because the statements in the letter are nontestimonial, they do not implicate the Confrontation Clause, and thus there is no reversible error.

4.

Next, Green challenges some of the government's exhibits. Green contends that the government unlawfully introduced the "E Team Jan. 2016" list and four photos of ballistic vests and plates as evidence. According to Green, the evidence was irrelevant under

Federal Rule of Evidence 401, and was unduly prejudicial under Federal Rule of Evidence 403. Because the evidence was both relevant and not unduly prejudicial, we find the district court acted within its discretion by admitting it.

"The standard for what constitutes relevant evidence is a low one . . . ." *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002). Under Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Green argues that the "E Team Jan. 2016" list was irrelevant because "beyond the writing itself, which is not self-evident as to its meaning or purpose, no lawfully admissible evidence exists to explain it." Green's Br. at 42–43. But as Green concedes, Chambers's jailhouse letter, which we have concluded was admissible evidence, explains its significance. Chambers wrote: "I took my briefcase wit' me. I had my book of knowledge, my Moorish National documents, [and] a notebook that had a list of da G Side E-team in 2016." Doc. 341-239 at 6. Therefore, the "E Team Jan. 2016" list itself was relevant evidence, as it tended to establish that Green was a member of the enforcement team that punished Gangster Disciples who violated gang rules, and that he committed the murders of Jackson and Ruff as part of his role in the gang.

As to the ballistic vests and plates, Green argues that the government did not introduce any evidence that connected those items to his role on the enforcement team. To be sure, that

evidence could support other inferences as well—Green could have hypothetically used those items while moonlighting as a bouncer, or he could have worn the vest regularly out of fear. But to pass Rule 401's relevancy test, "a single relevant inference suffices," even if that inference is not the best one or most likely one. 22 Wright & Miller's Federal Practice & Procedure Evidence § 5165 (2d ed. 2025). That relevant inference exists on this record; Green's possession of those items could lead the jury to infer that Green used those items to carry out dangerous enforcement team tasks like the murders the government attributed to him.

Now that we have established that the evidence was relevant, we turn to Rule 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "In criminal trials relevant evidence is inherently prejudicial." *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984). That is why "[t]he balance under Rule 403 should be struck in favor of admission." *Finestone*, 816 F.2d at 585 (citation modified). We "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Id.* (quoting *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983)). Indeed, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *Id.* (quoting *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984)).

Turning first to the "E Team Jan. 2016" list, Green argues that the admission of the list was unfairly prejudicial because the evidence established that Chambers possessed the list right after Green committed the murders, which proves "an active connection between . . . Green and the G-side E-Team." Green's Br. at 45. That evidence was probative on the relevant question of whether Green was an enforcer within the Gangster Disciples. And although that evidence certainly prejudiced Green, that prejudice was due to its probative value to the government's case. The evidence does not even approach Rule 403's exclusionary territory reserved for unfairly prejudicial evidence.

The same is true for the photos of the ballistic vests and plates. Green says it was "unfair and misleading" for the government to have introduced those photos, because it could have "lure[d]" the jury into finding that "Green [was] engaged in unlawful violence." *Id.* The government presented a mountain of evidence that established that Green did in fact engage in unlawful violence and murdered two men in a storage unit out of allegiance to the Gangster Disciples. So Green's possession of a ballistic vest and plates does support the idea that he was engaged in unlawful violence: that is exactly what the government needed to prove. It was fair game for the government to introduce that evidence, and the evidence did not mislead the jury—it just led the jury to a conclusion that Green did not prefer.

The district court did not abuse its discretion by admitting the evidence as relevant under Rule 401, nor did it abuse its discretion by refusing to exclude the evidence under Rule 403.

*B.*

1.

We now address Chambers's arguments, starting with the motion for continuance. Chambers contends that the district court abused its discretion when it denied his motion for a continuance. We disagree.

"The Sixth and Fourteenth Amendments to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and punished by imprisonment." *United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995). And "[u]nder certain circumstances, denial of a motion for continuance of trial may vitiate the effect of this fundamental right." *Id.*

But "[t]he right to assistance of counsel, cherished and fundamental though it be, may not be put to service as a means of delaying or trifling with the court." *United States v. Fowler*, 605 F.2d 181, 183 (5th Cir. 1979). A defendant may not "use the right to counsel as a means to manipulate the court and cause delay." *United States v. Graham*, 643 F.3d 885, 894 (11th Cir. 2011). And we have cautioned that "[j]udges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay." *Bowman v. United States*, 409 F.2d

225, 227 (5th Cir. 1969) (quoting *United States v. Llanes*, 374 F.2d 712, 717 (2d Cir. 1967)). Accordingly, our rule is that "[d]enial of a continuance, requested by a defendant in order to permit additional preparation for trial, must be upheld unless the defendant can show an abuse of discretion and specific, substantial prejudice." *United States v. Saget*, 991 F.2d 702, 708 (11th Cir. 1993).

Chambers contends that the district court abused its discretion because the issue "was not that counsel needed *additional* time to prepare, but that he had no ability to prepare at all." Chambers's Br. at 44. But the blame for that fact is not on the district court, but on Chambers. Chambers's delay tactics in this case are well-documented. He routinely disrupted proceedings and insisted on making frivolous "sovereign citizen" arguments. And he repeatedly expressed his desire to the trial court to represent himself and disclaimed any need for counsel for over a year. It was not until a week before the trial was scheduled to begin that Chambers first mentioned the possibility that counsel would represent him—and the counsel that Chambers referenced never made an appearance. Chambers asked the district court to appoint his stand-by counsel as his counsel on the morning of opening statements after being coached to do so as a delay tactic by his father.

The district court's denial of Chambers's obvious attempt to delay the proceedings against him "did not result in the loss of [his] right to counsel." *Graham*, 643 F.3d at 894. Although Chambers's stand-by counsel had little time to prepare for the case, that circumstance was created—indeed, invited by—Chambers's

"manipulative conduct and his repeated insistence on representing himself" until the last possible moment. *Id.*; *see also United States v. Ross*, 131 F.3d 970, 988 (11th Cir.1997) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (quotation marks omitted)).

Apart from Chambers's delay tactics, he has failed to establish any "specific, substantial prejudice" that resulted from the denial of his motion for a continuance. *Saget*, 991 F.2d at 708. "To make such a showing, [the defendant] must identify relevant, noncumulative evidence that would have been presented if his request for a continuance had been granted." *Id.* All Chambers can do is point to the difficulty his counsel had in wading through the pile of evidence pointing to his guilt. He supplies no reason for this Court to believe that the outcome of his trial would have been different had the district court granted his motion for a continuance. *United States v. Valladares*, 544 F.3d 1257, 1264 (11th Cir. 2008).

The denial was within the district court's discretion.

### 2.

Chambers next argues that the district court erred in the way it empaneled an anonymous jury. To be clear, Chambers does not challenge the district court's decision to use an anonymous jury. Instead, he contends that the district court failed to give a precautionary instruction to the jury to explain why it used numbers instead of names for juror identification, and why it had jurors transported to the courthouse from an off-site location each day.

Chambers did not object to any of the district court's anonymous jury procedures, so we review this argument for plain error. "An error cannot be plain unless the issue has been specifically and directly resolved by the explicit language of a statute or rule or on point precedent from the Supreme Court or this Court." *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019). Chambers cannot establish plain error here because no binding authority explicitly requires the precautionary instruction that Chambers favors. In fact, two of our precedents hold that the failure to issue a special precautionary instruction on the use of anonymous jury procedures was *not* plain error. *See United States v. Bowman*, 302 F.3d 1228, 1239 (11th Cir. 2002); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1035 (11th Cir. 2005).

3.

Chambers argues that the district court's shackling procedure was improper. Although Chambers concedes that the jury never viewed his shackles, he argues that the courtroom procedures reflected that he was not free to move about the courtroom, which unnecessarily prejudiced him. He contrasts the free movement of the attorneys against the movement of his codefendant Browner, who proceeded *pro se* at trial and had to examine witnesses from her table.

Once again, Chambers did not object to the district court's shackling procedure, so we review this issue for plain error. Our precedent confirms that there is no error, plain or otherwise, when the jury is unable to view the defendant's shackles. *Caldwell*, 81

F.4th at 1178–79; *Ahmed*, 73 F.4th at 1377–78; *see also Moon v. Head*, 285 F.3d 1301, 1318 (11th Cir. 2002); *United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir. 1998).

4.

Chambers argues that the cumulative effect of the district court's errors in denying the continuance, of the anonymous jury procedure, and of the shackling procedure, deprived him of a fair trial. But "[w]here there is no error or only a single error, there can be no cumulative error." *United States v. Daniels*, 91 F.4th 1083, 1101 (11th Cir. 2024) (quoting *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011)). Because we find no error on those individual issues, there is no basis for reversal on cumulative error grounds.

5.

Chambers contends that the district court erred during sentencing by relying on a higher mandatory minimum sentence than the jury verdict authorized for his conviction under 18 U.S.C. § 924(c)(1)(A). Chambers says that the district court should have relied on the five-year mandatory minimum provision under section 924(c)(1)(A)(i) instead of the ten-year provision under section 924(c)(1)(A)(iii). That change could have resulted in Chambers receiving two consecutive life sentences plus a consecutive five-year sentence instead of two consecutive life sentences plus a consecutive ten-year sentence. We decline to review Chambers's challenge—the error was harmless because Chambers's term of imprisonment would not change.

Chambers correctly asserts, and the government concedes, that the jury found that Chambers "[u]sed or [c]arried" a firearm for his section 924(c)(1)(A) conviction, and it did not find that he "[d]ischarged" a firearm. Chambers's Br. at 22–25; *see* Gov't's Br. at 57 n.19. The mandatory minimum sentence for using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime" is five years. 18 U.S.C. § 924(c)(1)(A)(i). The mandatory minimum sentence for discharging a firearm under those circumstances is ten years. *Id.* § 924(c)(1)(A)(iii). So both parties agree that the presentencing report was incorrect when it stated that Chambers's mandatory-minimum sentence for his section 924(c) conviction was ten years instead of five, because the jury found only that Chambers used or carried a firearm, not that he discharged it.

That error, though, was harmless and does not require reversal because any sentence Chambers received for his section 924(c) conviction would run consecutive to his two consecutive life sentences on his other convictions, including the unchallenged life sentence on count one. The principles behind our concurrent sentence doctrine explain why reversal is not warranted. "The concurrent sentence doctrine provides that, if a defendant is given concurrent sentences on several counts and the conviction on one count is found to be valid, an appellate court need not consider the validity of the convictions on the other counts." *United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011) (quoting *United States v. Fuentes–Jimenez*, 750 F.2d 1495, 1497 (11th Cir. 1985)). "Only when the defendant would suffer adverse collateral consequences from

the unreviewed conviction does the doctrine not apply." *Id.* (citation modified).

Our decision in *Bradley* explains why the concurrent sentence doctrine applies in cases like these. There, the district court sentenced the defendant to 240 months of imprisonment on one count, a concurrent 240 months on a second count, and a concurrent 60 months on a third count. *Id.* We upheld the defendant's convictions on all three counts, and we upheld one of his 240-month sentences. *Id.* at 1293–94. We observed that the defendant's "ultimate term of imprisonment would not change even were we to find error in the district court." *Id.* at 1294. So we declined to review the defendant's challenge to his sixty-month sentence and his other 240-month sentence on the grounds that he "would suffer no adverse collateral consequences from our refusal to review." *Id.*

As its name suggests, the concurrent sentence doctrine usually applies when a defendant challenges a sentence that runs concurrent to, and is shorter than or equal to, another lawful sentence. But it applies just the same to a defendant in Chambers's position who is contesting a sentence that runs consecutive to a life sentence. The logic holds because "given the abolition of parole in the federal system 'life' and 'life plus x years' come to the same thing." *Harris v. Warden*, 425 F.3d 386, 387 (7th Cir. 2005). So if a defendant is sentenced to life on at least one count, and a term of years (or life) on another count, it makes no difference whether the term of years (or another term of life) runs concurrent with or consecutive to the term of life. Either way, the defendant will never leave

prison. And that remains true regardless of whether any sentence concurrent with or consecutive to a life sentence is maintained, vacated, or modified.

Chambers would not suffer any other "adverse collateral consequences" from our refusal to review his challenge either. *Bradley*, 644 F.3d at 1294. The Supreme Court has cautioned us that one consequence we must consider is monetary fees associated with a conviction. *See Ray v. United States*, 481 U.S. 736, 737 (1987). In *Ray*, the Fifth Circuit invoked the concurrent-sentence doctrine after a defendant challenged three convictions and three identical sentences that ran concurrent to one another. *Id.* at 737. The Supreme Court vacated and remanded because the defendant owed a $50 special assessment fee per conviction. *Id.*; *see* 18 U.S.C. § 3013. Because the defendant's obligation to pay the special assessment fee depended on the validity of each conviction, the sentences were not truly concurrent. *Ray*, 481 U.S. at 737. But here, Chambers is not challenging the validity of his section 924(c) conviction. Even if Chambers were resentenced with a different mandatory minimum term of imprisonment—which is the relief he seeks—he would still owe the now $100 special assessment fee attached to every felony conviction. *See* 18 U.S.C. § 3013(a)(2)(A).

So we join our sister circuits today in holding that the concurrent sentence doctrine applies to a challenge to a sentence that runs concurrent with or consecutive to a valid life sentence. *See Al-'Owhali v. United States*, 36 F.4th 461, 467 (2d Cir. 2022); *Duka v. United States*, 27 F.4th 189, 194 (3d Cir. 2022); *Ruiz v. United States*,

990 F.3d 1025, 1033–34 (7th Cir. 2021); *Oslund v. United States*, 944 F.3d 743, 746 (8th Cir. 2019). "This common-sense approach preserves valuable and limited judicial resources for deciding those cases which might actually result in practical changes for the litigants." *Duka*, 27 F.4th at 194. There is no reason to entertain Chambers's arguments about his ten-year sentence when he will serve two consecutive life sentences, as any change to his ten-year sentence "will have no effect on the time he must serve in prison." *Al-'Owhali*, 36 F.4th at 467; *see also United States v. Campa*, 529 F.3d 980, 1018 (11th Cir. 2008) (holding that we "need not remand for resentencing" because a defendant was sentenced to life imprisonment on one conviction, so any error on the district court's calculation of his other sentence was "irrelevant to the time he will serve in prison." (quoting *United States v. Rivera*, 282 F.3d 74, 77–78 (2d Cir. 2000)). Further, Chambers will not suffer any other collateral consequences, such as a special assessment fee, from our refusal to remand. *See Ray*, 481 U.S. at 737. Accordingly, we find the district court's error to be a harmless one, which does not require reversal. *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020).

### 6.

Chambers also argues that the district court procedurally erred during sentencing because it relied on the government's legally incorrect double jeopardy argument to decide to merge count four into count two instead of count two into count four. We affirm on two alternative grounds. First, we believe that the district court committed no error and properly exercised its discretion to

avoid a potential constitutional issue when it merged Chambers's conviction on count four into his conviction on count two. Second, even if there were error, we conclude that any error was harmless in light of the life sentence that Chambers received on count one.

a.

We begin by addressing the district court's exercise of discretion in merging Chambers's conviction on count four into count two. The Double Jeopardy Clause "protects against multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (citation modified). When a district court encounters what would be a double jeopardy violation, it must "exercise its discretion to vacate one of the underlying convictions." *Ball v. United States*, 470 U.S. 856, 864 (1985).

Here, all parties agreed that Chambers could not be convicted of both count four (use of the firearm to cause the death of another person) and count two (VICAR murder). The government asked the district court to resolve this double jeopardy issue by vacating Chambers's conviction on count four and sentencing him on count two, which carried a mandatory life sentence. Browner convinced the district court to merge her convictions in the opposite direction—dropping count two and leaving count four. Afterward, the government raised the possibility that doing the same thing in Chambers's case could create a second, separate cumulative punishment problem for Chambers, who had a 924(c) conviction that Browner did not. Specifically, the government suggested that punishing Chambers under count three (section 924(c)) and

count four (section 924(j)) might amount to more cumulative punishment, requiring the vacatur of one of those convictions as well.

Chambers contends that the government's argument was wrong, and that sentencing him for violating both section 924(c) and section 924(j) does not pose a cumulative punishment problem. For support, he cites our observation in *United States v. Julian*, 633 F.3d 1250, 1256 (11th Cir. 2011), in which we said that we were "unpersuaded by the argument of the United States that the imposition of sentences under both section 924(c) and section 924(j) would violate the Double Jeopardy Clause of the Fifth Amendment." He says that the government's contrary argument tainted the district court's discretionary decision to merge count four into count two, resulting in a mandatory life sentence under the VICAR murder statute.

We disagree. The district court acted within its discretion to avoid raising an additional constitutional question. *See Pittman v. Cole*, 267 F.3d 1269, 1285 (11th Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions." (quoting *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149 (2d Cir. 2001)). We meant what we said in *Julian*—we have serious doubts that punishments under both sections 924(c) and 924(j) violate the Double Jeopardy Clause. *See Julian*, 633 F.3d at 1256. Still, "[o]ur holding" in that decision, "as always, is limited to the facts." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 n.8 (11th Cir. 2008). The issue on appeal in *Julian* was whether section 924(c)(1)(D)'s prohibition on concurrent imprisonment applied to two convictions

under section 924(j). *See Julian*, 633 F.3d at 1252. Because the question before us in *Julian* was about whether section 924(j) sentences had to run consecutive to one another, we did not *hold* anything regarding the interplay between sections 924(c) and 924(j). *See id.*

Moreover, the district court expressly relied on other considerations when it chose to drop count four and leave count two. Specifically, the district court examined the factual circumstances of Chambers's conduct and considered how any potential merger would impact the just punishment for Chambers's crimes. *See* 18 U.S.C. § 3553(a)(2)(A). For instance, the district court explained that it had merged Browner's VICAR murder conviction into her 924(j) conviction, in part, because she was not as culpable as Chambers; "she followed [his] orders." Doc. 479 at 90; *see id.* at 50–51, 73. But Chambers was more culpable. As the district court put it, "All of what happened here is entirely because of you." *Id.* at 90. Chambers "clearly orchestrated all" of the criminal activity in this case, took comfort in the fact that no one ever saw him commit a crime, and he had no remorse. *Id.* Because of Chambers's great culpability, the district court chose to merge Chambers's convictions in a way that left his VICAR murder conviction intact, resulting in a mandatory life sentence.

b.

In any event, even if the district court erred by considering the government's argument in deciding how to merge the convictions, any error was harmless. *See Pon*, 963 F.3d at 1227. No matter how the district court merged counts two and four, any sentence

Chambers received on the remaining count would run either concurrent with or consecutive to his unchallenged, non-mandatory, within-guidelines life sentence that the district court imposed on count one. Again, it will make no difference to Chambers whether he serves one or two life sentences, or life plus a term of years; he will be incarcerated until his death. *See Harris*, 425 F.3d at 387. Nor will Chambers suffer any other consequence, such as an additional special assessment fee. *See Ray*, 481 U.S. at 737; 18 U.S.C. § 3013(a)(2)(A). In Chambers's view, he should have been sentenced on counts one, three, and four instead of counts one, two, and three. Either way, he would owe the same $300 special assessment fee that the district court imposed here. 18 U.S.C. § 3013(a)(2)(A). Because this issue "will have no effect on the time" Chambers "must serve in prison," *Al-'Owhali*, 36 F.4th at 467, and Chambers will not suffer any other "adverse collateral consequences," *Bradley*, 644 F.3d at 1294, we "need not remand for resentencing" because any error is harmless, *Campa*, 529 F.3d at 1018.

7.

Lastly, Chambers argues that the district court lacked the authority to order that he pay restitution to Ruff's father under the Mandatory Victims Restitution Act. *See* 18 U.S.C. § 3663A (2020) (amended 2024). This issue presents a close question of statutory interpretation that has divided our sister circuits. Although the text is ambiguous, we think that the text of the Act favors the district court's interpretation. And the district court's interpretation of the Act is in line with Congress's recent amendment resolving the

circuit split. Under our precedent, we see Congress's amendment as a clarification of the Act's original meaning.

Under the Act, when a defendant is convicted of "a crime of violence," the district court "shall order . . . that the defendant make restitution to the victim of the offense." *Id.* § 3663A(a)(1), (c)(1)(A)(i). "The order of restitution shall require" that the defendant "reimburse the victim for lost income . . . incurred during . . . attendance at proceedings related to the offense." *Id.* § 3663A(b)(4). The statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense." *Id.* § 3663A(a)(2). But, if the victim "is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section." *Id.* § 3663A(a)(2).

Here, the district court ordered Chambers to pay $952.80 in restitution to Ruff's father for income that he lost while he attended court proceedings. At the time the district court issued the restitution order, our sister circuits were split on whether the Act allowed restitution to compensate the family member of a deceased victim for the family member's lost income or related costs of attending proceedings. The Eighth and Tenth Circuits held that the family member could not recover under those circumstances. *See United States v. Wilcox*, 487 F.3d 1163, 1176–78 (8th Cir. 2007); *United States v. Casados*, 26 F.4th 845, 848–54 (10th Cir. 2022). The Second, Third, and Ninth Circuits held that the family member could

recover. *United States v. Douglas*, 525 F.3d 225, 252–54 (2d Cir. 2008); *United States v. Hayward*, 359 F.3d 631, 642 (3d Cir. 2004); *United States v. Pizzichiello*, 272 F.3d 1232, 1240–41 (9th Cir. 2001).

The government argues that, in a case with a deceased victim, a family member may step into the victim's shoes and recover the same kind of costs that the victim could have recovered if he had lived. Chambers contends that we should follow the Eighth and Tenth Circuits and hold that, because Ruff the deceased victim did not have "lost income" during a trial for his own murder, his living family member is ineligible to collect his lost income for attending the trial.

Congress has since passed a clarifying amendment that resolves the circuit split over the meaning of this language in the government's favor. One month after the district court entered its restitution order, Congress added a subsection titled, "Clarification." 18 U.S.C. § 3663A(a)(4) (2024). That section says that "[i]n ordering restitution under this section, a court shall order the defendant to make restitution to a person who has assumed the victim's rights under paragraph (2) to reimburse that person's necessary and reasonable . . . lost income." *Id.* § 3663A(a)(4)(A). Congress's clarifying amendment makes plain that the person who assumes the victim's rights under the statute is entitled to recover his or her own lost income.

We believe Congress's clarifying amendment cinches the case in favor of the government's position. Our precedents hold that when there is "a conflict among the courts in construing [a]

statute[]," as was the case here, that gives us "an indication that a subsequent amendment is intended to clarify, rather than change, the existing law." *In re Fielder*, 799 F.2d 656, 660 (11th Cir. 1986) (citation modified); *see also United States v. Sepulveda*, 115 F.3d 882, 885 n.5 (11th Cir. 1997) ("Congress may, however, amend a statute to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases. Thus, an amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." (citation modified)); *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283–84 (11th Cir. 1999) (observing that when "a conflict or ambiguity exist[s] . . . courts view this as an indication that a subsequent amendment is intended to clarify, rather than change, the existing law"). Moreover, Congress expressly declared that the amendment was a clarification in the text of the amendment. We "may rely upon a declaration by the enacting body that its intent is to clarify the prior enactment." *Piamba Cortes*, 177 F.3d at 1284; *see also Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380–81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.").

We think that principle applies here because two conditions are satisfied: (1) the interpretation of the prior law is fairly debatable, and (2) Congress's stated intention is in the text of the statute itself. *See Piamba Cortes*, 177 F.3d at 1283–84.

As to the first condition, we think the interpretation of the prior law was fairly debatable, as reflected by the three-to-two circuit split. The statute said that, when a crime is committed against

a certain type of victim (minors, incapacitated, incompetent, or deceased), "another family member . . . may assume the victim's rights." 18 U.S.C. § 3663A(a)(2). The statute also defined those rights: the defendant shall "reimburse the victim for . . . transportation" and "for . . . other expenses incurred during participation in the investigation or prosecution of the offense." *Id.* § 3663A(b)(4). But, under the Eighth and Tenth Circuit's reading, an adult family member who transports a child victim to court cannot get his costs reimbursed—precisely because the victim is a child who could not incur his own costs. The same is true for incompetent and incapacitated victims who—by their very nature—will not incur their own expenses to participate in the investigation or prosecution. Although the Eighth and Tenth Circuit's reading is not without some support in the statute's text, we ordinarily reject interpretations of statutes that render the language of the statute meaningless. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). And we favor a "textually permissible interpretation that furthers rather than obstructs the document's purpose." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 4, at 63 (2012); *see also Belevich v. Thomas*, 17 F.4th 1048, 1053 (11th Cir. 2021). Because the meaning of the prior text was at least fairly debatable, we give considerable weight to Congress's position that it merely clarified what the law has always been.

On the second condition, Congress stated that the amendment was a clarification in the statute's text, not legislative history or the like. "Congress has proceeded formally through the

legislative process." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). This is not a "mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant." *Id.*; *see United States v. Thigpen*, 4 F.3d 1573, 1577 (11th Cir. 1993) (en banc) ("A committee report does not have the force of law . . . ."). Instead, Congress's view of the proper interpretation of the prior text is the text of the new law itself.

Finally, although Chambers raises the prospect of an Ex Post Facto Clause problem, there is no ex post facto issue here. The Ex Post Facto Clause "prohibits the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *United States v. Colon*, 707 F.3d 1255, 1258 (11th Cir. 2013) (citation modified). Here, there is no imposition of more severe punishment because there is no *new* law. Congress merely *clarified* what was already true: the version of the Act in effect at the time the district court issued Chambers's restitution order allowed for the payment of lost income to Ruff's father.

**IV.**

We **AFFIRM.**

LUCK, Circuit Judge, concurring in part and dissenting in part:

I join all but parts III.B.6.a and III.B.7 of the thorough and thoughtful majority opinion. I do not join part III.B.6.a because, as the majority opinion explains in part III.B.6.b, any sentencing error would be harmless under the concurrent sentence doctrine.

As to part III.B.7, the issue is whether the pre-amendment version of the Mandatory Victims Restitution Act allows restitution to compensate a deceased victim's family member for the family member's lost income while she attends court. The majority opinion holds that the relevant language of the Act is ambiguous and resolves the ambiguity by looking to Congress's post-judgment amendment of the Act.

I respectfully dissent because the Act is not ambiguous. As the Tenth Circuit explained in *United States v. Casados*, 26 F.4th 845 (10th Cir. 2022), the Act unambiguously does not allow restitution for the wages a deceased victim's family member misses out on while attending court—so we don't have to look anywhere else to understand the Act's meaning.

> [T]he [Act] requires restitution when a defendant commits a "crime of violence" for which there is an "identifiable victim or victims" who "suffered a physical injury or pecuniary loss" because of the defendant's crime. [18 U.S.C.] § 3663A(c)(1); *see also* § 3663A(a)(1). The [Act] further provides a specific definition of the term "victim," explaining that a "victim" is "a person *directly and proximately harmed* as a result of the commission of an offense for which

restitution may be ordered." § 3663A(a)(2) (emphasis added). In the next sentence, the statute additionally explains that when the victim "is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section." *Id.*

The [Act] then lists several categories of expenses that qualify for restitution: property loss, medical expenses for injured victims, funeral expenses for deceased victims, and transportation and other expenses related to investigation and prosecution. § 3663A(b). Set out in full, these four categories require the defendant to:

> (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—
>
> (i) the greater of—

(I) the value of the property on the date of the damage, loss, or destruction; or

(II) the value of the property on the date of sentencing, less

(ii) the value (as of the date the property is returned) of any part of the property that is returned;

(2) in the case of an offense resulting in bodily injury to a victim—

(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

(B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

(C) reimburse the victim for income lost by such victim as a result of such offense;

(3) in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the

cost of necessary funeral and related services; and

(4) in any case, reimburse the victim for lost income and necessary child[]care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

§ 3663A(b)(1)–(4).

On appeal, [the defendant] argues that the district court exceeded its authority in awarding restitution to [the deceased victim's son] under § 3663A(b)(4) for transportation expenses he and his family incurred to attend [the defendant]'s detention hearing. In this regard, [the defendant] recognizes that [the son] could "assume the . . . rights" of his deceased mother under § 3663A(a)(2). But she contends that the assumption-of-rights provision only permits [the son] to seek restitution on behalf of his mother for *his mother's* qualified expenses. In other words, according to [the defendant], the [Act] does not permit the district court to substitute the representative's expenses for the victim's expenses or make the victim's representative into a victim in his or her own right. Thus, [the defendant] asserts, the district court erred in ordering her to pay the travel expenses incurred by [the son] and his wife and two children.

The government, on the other hand, argues that by assuming the victim's rights, [the son] assumed all the rights the victim "would have had *if she were able to exercise them.*" . . .

The parties' opposing positions require us to consider the scope of the phrase "assume the victim's rights under this section" in § 3663A(a)(2) in conjunction with the operative language of § 3663A(b)(4), which governs the specific category of restitution at issue here, transportation expenses incurred to attend a proceeding related to the offense. Beginning with the phrase "assume the victim's rights under this section," we first consider the definition of the word "assume." As [the defendant] points out, the term "'[a]ssume' means to take over the rights or obligations of *someone else.*" [*S*]*ee also Assumption*, Black's Law Dictionary (11th ed. 2019) ("The act of taking (esp. someone else's debt or other obligation) for or on oneself . . . ."); *Assume*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/assume (last visited Jan. 15, 2022) ("[T]o take over (the debts of another) as one's own."). Next, the statute tells us that the individual whose rights are assumed by the representative is the "victim," defined in the preceding sentence as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." § 3663A(a)(2).

That leaves the question of what "rights" are assumed. The statute tells us it is the "rights under

this section"—that is, the right to receive the types of restitution outlined in § 3663A. We therefore look to the remainder of the statute, and more specifically, to § 3663A(b), which lists the categories of restitution that are compensable. As [the defendant] points out, the plain language of the statute expressly limits these categories of expenses to *the victim's* specific losses, a limitation that makes sense in light of the express definition of a victim as someone "directly and proximately harmed as a result of the commission of [the] offense." § 3663A(a)(2); *see also* § 3663A(b)(1)–(4). For instance, the [Act] mandates restitution for the costs of funeral expenses for a deceased victim or medical costs for an injured victim—costs that could only be incurred by the victim. *See* § 3663A(b)(2)(A)–(B), (b)(3). Likewise, the property-loss category focuses on restitution for damage or loss caused by the offense to "property *of a victim.*" § 3663A(b)(1) (emphasis added). And the other categories of loss subject to restitution are also directly limited to the victim's own losses by the statute's plain language: They are prefaced with the phrase "reimburse *the victim.*" § 3663A(b)(2)(C), (b)(4) (emphasis added). Indeed, as relevant here, the [Act] requires restitution to "reimburse *the victim* for . . . transportation[ ] and other expenses incurred during . . . attendance at proceedings related to the offense." § 3663A(b)(4) (emphasis added). Thus, the [Act] specifically limits restitution to reimbursement of the victim's covered losses. Accordingly, when a representative assumes the victim's

right to restitution, he or she assumes the right to receive restitution for the victim's covered losses.

In arguing for a broader interpretation, the government acknowledges that § 3663A(a)(2) merely permits a family member or other individual to "represent the victim" and does not cause the representative to "become the victim." Nevertheless, the government contends that in assuming the victim's rights, [the son] assumed all the rights that the victim "would have had if she were able to exercise them," reasoning that had the victim here lived, she would have been entitled to restitution for transportation expenses incurred to attend [the defendant's] detention hearing. The government therefore maintains that the district court acted within its authority by awarding [the son] travel expenses he incurred to attend the hearing. But this interpretation fundamentally misreads § 3663A(a)(2) and effectively adds text to the statute, which is something we cannot do. Section 3663A(a)(2) does not state that a victim's representative assumes the rights the victim would have had if the victim were able to exercise them; it simply permits the representative to assume "*the victim's* rights." Thus, the representative's assumption of the victim's rights does not permit the representative to receive reimbursement of his or her own expenses because the representative only assumes the victim's rights— that is, the restitution owed *to* the victim. . . .

. . . .

. . . . [T]he phrase "assume the victim's rights" does not permit a victim's representative to transform the [Act] from a victim-compensation statute into a vehicle for reimbursing the representative's own expenses. Even if there might be "good policy reasons for allowing a court to order reimbursement" of the representative's lost income, childcare, or travel expenses, we "do not think the present statutory language encompasses that policy."

Further, as the government itself points out, "the [Act]'s core purpose . . . is 'to ensure that victims, to the greatest extent possible, are made whole for their losses.'" But the government does not explain how the victim is made whole by a restitution order to be paid to someone other than the victim for that person's expenses. Contrary to the government's assertion, there is no reason in this case to conclude that [the victim] or her estate will be made whole by the district court's order of restitution to pay for [the son]'s personal travel expenses, or those of his family, which were not incurred by either [the victim] or her estate. And because the [Act] is intended to be compensatory, it should not be interpreted to require the defendant "to pay a sum of money to another entity" such that it "punishes the defendant without in any way compensating the victim."

*Casados*, 26 F.4th at 848–53 (footnotes and some citations omitted; some alterations in original); *see also United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007).

Because the relevant language of the Act is unambiguous, "we need look no further and our inquiry ends." *Ga. State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627, 631 (11th Cir. 2019). (The government does not argue, and the majority opinion does not hold, that Congress's post-judgment amendment of the Act applies retroactively.) The Act does not allow restitution to the victim's father for his lost wages to attend court proceedings, and the district court did not have the authority to order the lost wages as restitution unless "explicitly empowered by statute." *United States v. Dickerson*, 370 F.3d 1330, 1335 (11th Cir. 2004) (quoting *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996)). Because the district court exceeded its authority, I would vacate that part of the restitution award. Otherwise, I would affirm the defendants' convictions and sentences.